### UNITED STATES of America, Plaintiff–Appellee,

v.

### Dwayne Allen EDGE, Defendant– Appellant.

### No. 92–5327.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 19, 1993.

Decided March 24, 1993.

---

Van S. Vincent, Asst. U.S. Atty. (argued and briefed), Nashville, TN, for plaintiff-appellee.

E.E. Edwards, III, Nashville, TN, for defendant-appellant.

Before: JONES and SUHRHEINRICH, Circuit Judges; and CONTIE, Senior Circuit Judge.

PER CURIAM.

Defendant–Appellant Dwayne Allen[1] Edge appeals the district court's Judgment in a Criminal Case following a guilty plea and sentencing hearing. He pled guilty to knowingly and intentionally distributing marijuana[2] in violation of 21 U.S.C. § 841(a)(1) (1988). He was sentenced to 108 months of imprisonment and five years of supervised release as the district court found Edge to be responsible for distributing over 1000 marijuana "plants." On appeal, Edge contends that: (1) 21 U.S.C. § 841(b)(1)(A)(vii) (1988 & Supp. III 1991)[3] and Section 2D1.1(c) (n.*) of the United States Sentencing Commission's *Guidelines Manual* (Nov.1991) [hereinafter U.S.S.G.][4] violate his rights to due process and equal protection; (2) the police violated his right to due process of law by not preserving relevant evidence; and (3) the government did not meet its burden of proving that he distributed over 1000 marijuana "plants" because the majority of the confiscated marijuana cuttings in this case were not "plants" for federal sentencing purposes. Though we readily dismiss the first two assertions of error, we find merit in the third. We thus vacate the sentence imposed and remand the case for a disposition consistent with this opinion.

## I

In November 1990, Edge was introduced to Steven Mikels, an undercover officer with the Seventeenth Judicial District Drug Task Force in Davidson County, Tennessee. The two men negotiated a deal whereby Edge would deliver to Mikels 1000 marijuana "plants" and $13,000 in exchange for 1000 grams of cocaine. On February 28, 1991, the exchange took place. The marijuana was delivered in ten trays, each containing approximately 100 marijuana plant "clones" which Edge defined as cuttings from larger, more mature plants. The cuttings were set in a growing medium which was saturated with a rooting hormone.

Edge was "stung" and was subsequently indicted in the United States District Court for the Middle District of Tennessee on one count of knowingly and intentionally distributing marijuana in violation of 21 U.S.C. § 841(a)(1) ("Count One") and one count of knowingly and intentionally possessing with the intent to distribute cocaine in violation of the same statute ("Count Two"). On September 18, 1991, he pled guilty to Count One. Count Two was dismissed on motion of the government.

A presentence report was prepared. In it, the preparing probation officer deter-

---

1. Sometimes spelled "Allan" in the record.

2. Sometimes spelled "marihuana."

3. This provision reads, in relevant part:
   (b) Penalties
   Except as otherwise provided in section 859, 860, or 861 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
   (1)(A) In the case of a violation of subsection (a) of this section involving—

   .    .    .    .    .

   (vii) 1000 kilograms or more of a mixture or substance containing a detectable amount of marihuana, or 1,000 or more marihuana plants regardless of weight ...
   such person shall be sentenced to a term of imprisonment which may not be less than 10

years or more than life.... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph. No person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein.

4. The relevant portion of this footnote states:
   In the case of an offense involving marihuana plants, if the offense involved (A) 50 or more marihuana plants, treat each plant as equivalent to 1 KG of marihuana; (B) fewer than 50 marihuana plants, treat each plant as equivalent to 100 G of marihuana. *Provided,* however, that if the actual weight of the marihuana is greater, use the actual weight of the marihuana.
   (Emphasis in original.)

mined that Edge's conviction involved more than 1000 but less than 3000 kilograms of marijuana:

27. Base Offense Level: The instant offense involved a drug exchange transaction. The defendant agreed to exchange approximately 1,000 marijuana plants and $13,000 in cash for approximately one kilogram of cocaine. According to a foot note of the drug quantity table (see U.S.S.G. Section 2D1.1, Subsection C), cases involving marijuana plants are to treat each plant as equivalent to one kilogram of marijuana if the transaction involved 50 or more marijuana plants. In the instant offense, there were 1,010 marijuana plants delivered by the defendant. According to the guidelines, each plant is to be treated as equivalent to one kilogram of marijuana. Consequently, for guideline calculations, the 1,010 plants yield an equivalent of 1,010 kilograms of marijuana.

. . . .

29. However, the instant offense also involved an exchange drug transaction. As part of the deal, Mr. Edge was exchanging marijuana plants and cash for approximately one kilogram of cocaine. Consequently, the defendant is also held accountable for the one kilogram of cocaine bargained for in this transaction, pursuant to U.S.S.G. Section 1B1.3 (Relevant Conduct). This section requires all acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction be used in determining the applicable guideline range. Therefore, the drug quantities referenced in both counts of the Indictment are to be included in the determination of the base offense level. The Count One offense involved a total of 1,010 kilograms of marijuana. Count Two involves 1,079.2 grams of cocaine hydrochloride.

30. Since the drug equivalency table provides a means for combining different controlled substances, each drug must be converted to the marijuana equivalent weight. According to the drug equivalency table, 1,010 kilograms will yield the same amount in the marijuana equivalen-cy conversion. However, 1,079 grams of cocaine yields an equivalency of 215 kilograms of marijuana. Therefore, the total combined marijuana equivalent weight is 1,225 kilograms of marijuana.... [A]t least 1,000 kilograms but less than 3,000 kilograms of marijuana yield a base offense level of 32.

J.A. at 27–28.

A sentencing hearing was conducted. At this hearing, much evidence was introduced on the issue of whether the marijuana cuttings in question were "plants" for federal sentencing purposes. Edge testified that, the night before the exchange, he had cut about 700 to 800 growing tips of mature marijuana plants about one to two inches tall and placed them in a growing medium which was saturated with a rooting hormone. The remainder of the clones had been cut sometime previous to that night. He testified that a cutting takes about three to six weeks to develop a root.

On the topic of whether and to what extent the cuttings were plants, the government presented an expert witness in the field of botany, Dr. Robert Kral of Vanderbilt University. According to Dr. Kral, a plant must have: "the process of photosynthesis," *id.* at 104; "some kind of multicellular sex organs formed by [it]," *id.* at 105; and "a circulatory system," *id.* Dr. Kral testified that "a cutting is a plant." *Id.* at 106. It is a plant as soon as it is cut, according to Dr. Kral, and does not have to have a root. *Id.* at 121. On cross-examination, Dr. Kral admitted that, according to his definition of "plant," a seed or a leaf or a "seedlet or whatever the white things [off dandelions are] that blow in the wind" could be considered a "plant." *See id.* at 127, 128–30. He also admitted that he "wouldn't have any problem" with the following statement: "A cutting becomes a plant when it develops a root system sufficient to allow the cutting to maintain open stomas ... so it can exchange gas and provide for energy requirements." *Id.* at 131.

At the sentencing hearing, Dr. Kral ob-

served several of the marijuana cuttings.[5] Examining one of the clones, he noted "a swollen area that looks like some [callus tissue [6]] is forming there and that would be attributable to the beginning of a callus formation which roots will come." *Id.* at 111. The second cutting he examined possessed "[a]ctual roots." *Id.* The third cutting had "well developed roots." *Id.* at 112. Regarding the fourth cutting examined, Dr. Kral stated, "[D]own at the base [of the cutting] there is certainly not as much evidence of callus formation. It is just the beginning of it. Hardly that." *Id.* at 113. The fifth cutting had a "well developed root system." *Id.* at 114. It appears that Dr. Kral was also asked to observe and comment upon other cuttings that had developed roots and were attached to the planting medium. *See id.* at 115–17, 125. Finally, Dr. Kral reviewed a photograph of "plants" confiscated from Edge and noticed algae, which "means [the plants] have

been in there awhile, been potted for probably a fair length of time." *Id.* at 118–19.

■ The sentencing hearing was concluded on February 24, 1992. The district court determined that "there were a thousand ten plants and it will be from a thousand to 3,000 kilos of marijuana for guideline purposes." Transcript of Hearing Before the Honorable Thomas A. Wiseman, Jr. at 3 [hereinafter Transcript]; *see* U.S.S.G. § 2D1.1(c) (n.*). The court did not consider the cocaine involved in the exchange in its sentencing computations. The court's calculations yielded a base offense level of thirty-two. After being given credit for a two-level acceptance of responsibility reduction, *see* U.S.S.G. § 3E1.1(a), Edge was sentenced at an offense level of thirty. With a criminal history category of II, the sentencing guidelines imprisonment range was determined to be 108–135 months. He was sentenced to 108 months, to be followed by five years of supervised release.[7]

---

**5.** Apparently, these samples were to *"represent all* the plant material [from the trays] that was seized from Mr. Edge by Mr. Mikels at the time of Mr. Edge's arrest on February 28." J.A. at 147 (emphasis added).

**6.** Callus tissue, Dr. Kral described, is the "marker of the beginning of the development of [a] root." *Id.* at 109.

**7.** From the record before us, we do not understand how the district court could find Edge accountable for over 1000 marijuana plants (or over 1000 kilograms of marijuana) and not sentence the defendant to the statutory *minimum* of *120* months. *See* 21 U.S.C. § 841(b)(1)(A)(vii); *see also* J.A. at 22 (presentence report notes a *"Mandatory Minimum"* of "10 years").

As an aid to understanding what may have inspired the district court to impose a nine-year sentence in the face of a ten-year statutory minimum, the following colloquy is all we have discovered:

THE COURT: ... Is it a mandatory minimum of ten years in this case?

[ASSISTANT U.S. ATTORNEY]: Your Honor, I believe when he entered his change of plea we had advised him of it, not more than 20 or five to 40. The probation officer noted that in the report. That is the government's error.

It would in the mandatory, since he got acceptance of responsibility. Since it was the government's error the government would inure in that error.

THE COURT: If that were applicable the lower end would be 120 to 105, but we will leave it at 108 to—

[ASSISTANT U.S. ATTORNEY]: Yes, since it was my error.

Transcript at 4.

*Limited* authority to depart from mandatory minimum sentences is provided in 18 U.S.C. § 3553(e) (1988):

Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

In the instant case, there was seemingly no motion made by the government, and certainly no contention that Edge had provided substantial assistance, whether or not he did in fact provide it. Thus, departing below the statutory minimum was inappropriate. *See United States v. Snelling,* 961 F.2d 93, 97 (6th Cir.1991) ("a departure [under Section 3553(e)] must be based solely upon the 'substantial assistance' rendered by the defendant"); *United States v. Horn,* 946 F.2d 738, 745 (10th Cir.1991); *United States v. Thomas,* 930 F.2d 526, 528–29 (7th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991); *United States v. Pruitt,* No. 91–5339, 1992 WL 3709, at *2, 1992 U.S.App. LEXIS 539, at *4–*9 (6th Cir. Jan. 10, 1992).

A Judgment in a Criminal Case was entered on February 24, 1992. Edge timely filed his Notice of Appeal on March 4, 1992.

## II

### A

██ Edge claims that U.S.S.G. § 2D1.1(c) (n.*) and 21 U.S.C. § 841(b)(1)(A)(vii), which, given a certain threshold number of marijuana plants, equate one marijuana plant with 1000 grams of marijuana, are arbitrary and irrational, and thus violate his constitutional rights to due process and equal protection. Edge's argument is specifically foreclosed by a recent published decision, *United States v. Holmes,* 961 F.2d 599, 601–03 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 232, 121 L.Ed.2d 168 (1992). Since this panel cannot overrule another panel's published decision on the same issue, we are bound by *Holmes* and thus reject Edge's arguments on this score. *Salmi v. Secretary of HHS,* 774 F.2d 685, 689 (6th Cir. 1985); United States Court of Appeals for the Sixth Circuit, Internal Operating Procedures ch. 22.4.1 (June 12, 1991).

### B

██ Though Edge does not mention it as a specific assignment of error, he suggests that the government violated his right to due process of law by failing to preserve most of the marijuana cuttings. Since this argument was not raised below, we will only consider it if the case is "exceptional" or if refusing to consider it would produce a "plain miscarriage of justice." *Pinney Dock & Transport Co. v. Penn. Central Corp.,* 838 F.2d 1445, 1461 (6th Cir.) (quoting *Hormel v. Helvering,* 312 U.S. 552, 557–58, 61 S.Ct. 719, 721–22, 85 L.Ed. 1037 (1941)), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988); *United States v. Allen,* 954 F.2d 1160, 1168 (6th Cir.1992). Given the facts of this case and the standard to be applied, we exercise our discretion to not review the argument.

██ Even if we were to consider the argument, we note that Edge has not alleged, let alone shown, the requisite bad faith to substantiate this type of due process claim. *See Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); *United States v. Belden,* 957 F.2d 671, 673–74 (9th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 234, 121 L.Ed.2d 169 (1992); *Allen,* 954 F.2d at 1168–69; *United States v. Gibson,* 963 F.2d 708, 711 (5th Cir.1992); *United States v. Malbrough,* 922 F.2d 458, 463 (8th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2907, 115 L.Ed.2d 1071 (1991).

### C

"Defining the word 'plant' for purposes of the Sentencing Guidelines is a question of statutory construction subject to *de novo* review." *United States v. Eves,* 932 F.2d 856, 859 (10th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 236, 116 L.Ed.2d 192 (1991); *see also United States v. Bechtol,* 939 F.2d 603, 605 n. 3 (8th Cir.1991).

At the sentencing hearing, Dr. Kral offered a very broad definition of "plant." We are uncertain whether the district court accepted this definition en route to finding that "there were a thousand ten plants." Transcript at 3. In trying to ascertain the district court's view of what constitutes a "plant" for present purposes, we find the record of limited utility. One brief exchange on the topic proceeded as follows:

[COUNSEL FOR EDGE]: My problem is counting 10 or 15 grams of marijuana as a million—*I don't think they are plants. Some of them were but I don't think all were.* That is for Your Honor to wade through.

THE COURT: I decided that ... and I don't find it any more palatable than you do ... but I think Judge [Edgar, in *United States v. Lewis,* 762 F.Supp. 1314 (E.D.Tenn.), *aff'd,* No. 91–5729 [951 F.2d 350] (6th Cir. Dec. 30, 1991) (WESTLAW, Allfeds database),] is probably correct in his citation to the amendment [to 21 U.S.C. § 841(b)(1) ] and the Congression-

al Record [ (viz., 134 Cong. Rec. S17,360, S17,368 (daily ed. Nov. 10, 1988) (statements of Sen. Biden)) ] and Senator Biden's statements and motivations in doing what he offered the amendment to do. We are stuck with it.

Now let's see about the fine range.... *Id.* at 4–5 (emphasis added). Here, counsel for Edge seems to raise two concerns: (1) counting one marijuana plant as 1000 grams of marijuana if the transaction involved fifty or more plants; and (2) counting recently cut clones as "plants." The district court's response, however, appears to refer only to the first of counsel's two concerns. Judge Edgar in *Lewis* brought up the amendment to 21 U.S.C. § 841(b)(1) and Senator Biden's commentary on this amendment in the context of responding to a defendant's argument that treating one marijuana plant as equivalent to one kilogram of marijuana if the offense involves fifty or more marijuana plants violates due process. *See Lewis,* 762 F.Supp. at 1315–17.[8]

An earlier exchange between the district court and Dr. Kral suggests the district court may not have wholly adopted Dr. Kral's definition:

> THE COURT: You can manipulate language, Dr. Kral.
>
> The question before us here is whether or not a cutting that has no root system and has some Rootone on the bottom of the cutting and stuck into a plant medium or a growing medium and has yet to develop a root system, has yet to develop any ability to sustain itself, is that a plant?
>
> [DR. KRAL]: My way of looking at it is that it is. I, of course, have accepted a definition for it. Understanding all the pitfalls, I still accept it. Because I have hardly any choice in the matter.
>
> THE COURT: You have the choice of applying common sense to it, Dr. Kral.
>
> [DR. KRAL]: True enough.

THE COURT: That is a choice I think is out there for all of us.

> [DR. KRAL]: That is a judgment call. It always is.

J.A. at 107–08.

■ In this case, we make the "judgment call" to reject Dr. Kral's broad test of what constitutes a "plant" in favor of the more commonsensical, easy to administer test suggested by several other courts. Specifically, for a clone to be a "plant," there must be some readily observable evidence of root formation.

In *Eves,* the defendant was caught with several trays of conceded marijuana "plants" as well as contested marijuana cuttings. At his sentencing hearing, in an attempt to exclude the cuttings from the "plant" count, the defendant produced an expert witness, an assistant professor of biology. This expert testified that a cutting is not necessarily a plant. To determine whether a cutting has become a plant, he explained, one must look to whether it has a "root system sufficient to allow the cutting to maintain open stomas so that it can exchange gas and provide for energy requirements." 932 F.2d at 858. The district court rejected this test, opting for a simpler one, namely, whether the cutting has roots, or root balls. *See id.* at 857, 859–60.

The Tenth Circuit determined that the district court's test was correct as a matter of law. It wrote:

> ... In this case of statutory construction, we decline the invitation to accept the notion that Congress intended a highly scientific meaning to plant life similar to what gynecologists and obstetricians and ecclesiastics and philosophers have grappled with in the context of other highly publicized litigation....
>
> ....
>
> Appellant has not suggested to us, nor has our independent research disclosed, any aspect of legislative history that supports his theory that Congress intended

---

**8.** *Lewis* did involve defining the word "plant" for purposes of the sentencing guidelines, but in an inapposite context. There, Judge Edgar had to determine whether a once alive plant and now a dead "rootball" was still a "plant" for purposes of the federal sentencing guidelines. Here, we have to determine whether a "plant" ever existed to begin with.

"plant" to be construed other than by its plain and ordinary dictionary meaning. Nor is there any reason to conclude that such an interpretation was intended. This is a statute we are construing; we are examining a congressionally declared code of conduct with clearly defined penalties. We do not even begin to believe that Congress intended an abstruse interpretation that would require police officers to possess infrared gas analyzers to determine whether gas exchange is occurring in marijuana growth or to undergo botanical training in order to observe marijuana, in [the appellant's expert witness'] formula, over a period of time to see whether increments of new tissue appear. As Judge Devitt noted in [*United States v.] Fitol*, [733 F.Supp. 1312 (D.Minn.1990),] the legislative purpose was to remedy the problems associated with determining the weight of marijuana—specifically, whether seeds and stems should be weighed in the mix—and to supplant this test with a more simple method; a method providing that the number of "plants regardless of weight" would trigger the mandatory minimum sentence. 733 F.Supp. at 1315. We perceive that the congressional intent was to simplify, not to complicate, the method of determining the high end or low end mandatory sentences. To accept the appellant's formulation would be to turn our face on the legislative purpose.

We agree that the definition intended by Congress is the one accepted by the district court here: a marijuana "plant" includes those cuttings accompanied by root balls. Whether the plant could survive on its own would not be an issue; if it looks like a "plant"—that is, *if it has a reasonable root system*—it will be considered a "plant." No expert need testify, no experiments with instrumentation to monitor whether gaseous exchange is occurring need be conducted, no elaborate trimester or viability system need be established. If a cutting has a root ball attached it will be considered a plant.

In this manner, we will respect the precept that in the absence of legislative intent to the contrary, the plain and ordinary meaning of the statute controls. *Eves*, 932 F.2d at 857, 860 (emphasis added); *cf. Chapman v. United States*, — U.S. —, —, 111 S.Ct. 1919, 1925, 114 L.Ed.2d 524 (1991) ("Neither [21 U.S.C. § 841(b)] nor the Sentencing Guidelines define the terms 'mixture' and 'substance,' nor do they have any established common law meaning. Those terms, therefore, must be given their ordinary meaning.").

Similarly, in *Bechtol*, the Eighth Circuit held that a cutting with "root hairs," viz., "fine projections coming from the stem," 939 F.2d at 604, is a "plant" for purposes of the sentencing guidelines.[9] This holding was reaffirmed by the Eighth Circuit in *United States v. Curtis*, 965 F.2d 610, 616 (8th Cir.1992).

Other courts have also emphasized the importance of root systems, root structures, or roots in defining marijuana "plant" for federal sentencing purposes. *See, e.g., Malbrough*, 922 F.2d at 461, 465 (acquiescing in district court's apparent determination that certain marijuana cuttings that did not have their own "root system" should not be counted as "plants"); *United States v. Angell*, 794 F.Supp. 874, 875 (D.Minn.1992) (refusing to count as "plants" marijuana cuttings that "have no *visible root structure*") (emphasis added); *United States v. Fitol*, 733 F.Supp. 1312, 1316 (D.Minn.1990) ("It is ... clear that these individual cuttings, planted with the intent of growing full size plants, *and which had grown roots*, are "plants" both within common parlance and within Section 841(b).") (emphasis added); *United States*

9. Botanically speaking, root hairs are outgrowths of epidermal cells of roots. Apparently, they do not stem from stems. Telephone Interview with Dr. John Caruso, Professor of Biological Sciences, University of Cincinnati (Jan. 27, 1993) [hereinafter Telephone Interview with Dr. Caruso]; *see also* R. Darnley Gibbs, *Botany: An Evolutionary Approach* 264 (1950).

Thus, it seems that the "root hairs" referred to in *Bechtol* should be understood to mean "hair-like projections," 939 F.2d at 604 (testimony of Dr. Richard Pohl, stating that such projections are "the beginnings of a root system"), or "adventitious roots" protruding from callus tissue. Telephone Interview with Dr. Caruso; *see also* Gibbs, *supra*, at 267–69.

*v. Speltz*, 733 F.Supp. 1311, 1312 (D.Minn. 1990) ("Small marihuana plants, e.g. *cuttings with roots*, are 'marihuana plants' nonetheless.") (emphasis added), *aff'd*, 938 F.2d 188 (8th Cir.1991); *see also United States v. Lee*, 957 F.2d 778, 784 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992); *cf. United States v. Carlisle*, 907 F.2d 94, 96 (9th Cir.1990) (finding district court's determination that cuttings were plants where "[e]ach [cutting] had varying degrees of root formation" to be not clearly erroneous).

■ In the absence of specific direction by Congress to the contrary, we adopt a version of the relatively straightforward test put forth by the Tenth and Eighth Circuits. A marijuana cutting is a "plant" for federal sentencing purposes if there is readily observable evidence of root formation. A marijuana cutting with root balls or "root hairs" easily meets this test. Whether a marijuana cutting with mere callus tissue meets the test is a more difficult issue, and is important for resolving the instant case.

■ Dr. Kral testified that "callus tissue is a *marker of* the beginning of the development of [a] root." J.A. at 109 (emphasis added). Examining one of the clones at the sentencing hearing, he noted "a swollen area that looks like some [callus] is forming there and that would be attributable to the beginning of a callus formation *which roots will come."* Id. at 111 (emphasis added). From this, and from independent research, it appears that callus tissue should not be considered a root. Callus tissue is formed after a cutting is taken from a mature plant. The callus, an unorganized tissue mass, covers the newly exposed surface, or "wound." From the callus, then, organized cells extend, forming "adventitious roots."[10] Thus, for purposes of applying the test we have chosen, we conclude that a marijuana cutting with callus tissue, without more, is not a "plant"

for federal sentencing purposes. While all plant families may not have roots, *see* J.A. at 105 (testimony of Dr. Kral, citing "epiphytes" as an example), marijuana plants do. By adopting the aforementioned test, we provide a workable definition of the marijuana "plant," one which is commonly accepted in both the legal and botanical worlds.

## III

Since the district court may have employed an overbroad definition of "plant" in determining Edge to be accountable for over 1000 marijuana "plants," we vacate the sentence imposed and remand the case for resentencing in accordance with this opinion. We observe that at least two of the samples shown to Dr. Kral had no readily observable evidence of root formation as we have described it. Given this fact, if the samples are to represent the total number of cuttings seized, it would stand to reason that the actual number of "plants" Edge is responsible for is less than the total amount seized. The district court should make a specific finding of fact, explaining its determination of the number of marijuana "plants" according to the test we have set forth in this opinion.

SUHRHEINRICH, Circuit Judge, concurring.

I agree with the majority's rejection of Dr. Kral's broad test of what constitutes a "plant" in favor of the more straightforward one adopted by the Eighth and Tenth Circuits. I write separately only to express an underlying concern with what I view as an inappropriate use of expert witnesses to define statutory terms. Admittedly, the danger of transferring a nondelegable responsibility to interpret the Guidelines as a matter of law is less imminent when an expert testifies at a sentencing hearing with only the court present. Nonetheless, use of expert testimony to interpret statutes, regulations and guidelines

10. Telephone Interview with Dr. Caruso; *see also* Gibbs, *supra* note 7, at 267–69; *cf. Bechtol*, 939 F.2d at 604 (discussing testimony of Dr. Richard Pohl, a taxonomic botanist, who stated words to the effect that, "for a cutting to be a plant it ha[s] to have a root system," and that "the hair-like projections were the beginnings of a root system, and that a cutting with the projections was a plant").

with the force of law ties statutory construction to the nature and quality of evidence presented in an adversarial context.

Finally, as pointed out by the Tenth Circuit in *United States v. Eves*, 932 F.2d 856 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 236, 116 L.Ed.2d 192 (1991), there is no reason to believe that Congress intended anything other than an ordinary meaning of the statutory term. *Id.* at 859–60. If a highly scientific meaning were intended, that fact would be apparent from the face of the statute, or in the legislative history. Absent such an indication, we must "assum[e] that the ordinary meaning of the statutory language accurately expresses the legislative purposes." *Id.* at 859 (citation omitted).