**UNITED STATES of America, Appellee,**

v.

**John E. BURKE, Defendant, Appellant.**

No. 92–2057.

United States Court of Appeals,
First Circuit.

Heard May 6, 1993.
Decided Aug. 2, 1993.

Mark L. Randall with whom Mary A. Davis, Portland, ME, was on brief, for appellant.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, ME, and Timothy D. Wing, Asst. U.S. Atty., Bangor, ME, were on brief, for appellee.

Before BOUDIN, Circuit Judge, COFFIN and OAKES *, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

After the district court denied his suppression motion, appellant John Burke entered a conditional guilty plea to a charge that he knowingly manufactured marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On appeal, he renews his claim that the search warrant affidavit failed to show probable cause and that, consequently, evidence seized from his home must be suppressed. He also claims that the district court erred in calculating his sentence based on 50 marijuana plants and an equivalency of one kilogram per plant. We affirm.

## I. *Probable Cause*

In July 1991, Bangor Police Officer Roy McKinney applied for a warrant to search the home occupied by appellant Burke and his wife Susan at 330 Fern Street in Bangor, Maine. The affidavit filed by McKinney in support of the warrant application described two conversations in which an unidentified individual had reported to a confidential informant about an indoor marijuana growing operation. The informant, who had proven reliable in the past, had passed on the information to a Detective Gastia, who then passed it on to McKinney.

As reported in the affidavit, the unidentified person made the following assertions:

(1) A person named "John" was growing 40 marijuana plants in his house;

(2) The unidentified person had been to John's house, which was on Fern Street in Bangor, and it "reeked" of marijuana;

(3) The house had a new addition;

* Of the Second Circuit, sitting by designation.

(4) A search warrant previously had been executed at John's house, resulting in the seizure of marijuana plants from an indoor growing operation;

(5) John had "beat the charge".

The affidavit also contained the following additional information from McKinney:[1]

(6) In 1989, McKinney had executed a warrant at the home of John Burke, at 330 Fern Street, and uncovered an elaborate indoor marijuana growing operation;

(7) John Burke had not been prosecuted in connection with the 1989 seizure;

(8) 330 Fern Street had a new addition;

(9) Two cars parked at 330 Fern Street on June 19, 1991, were identified through Department of Motor Vehicle records as belonging to Susan and John Burke, of 330 Fern Street;

(10) Power consumption records for 330 Fern Street revealed a pattern of usage consistent with indoor marijuana cultivation, with a dramatic drop in usage following the 1989 search and substantial increases beginning again in the fall of 1990.

Burke contends that this affidavit was deficient and that the warrant therefore was invalid. His primary complaint is that the central information in the affidavit comes from an unidentified person whose reliability and credibility are untested and unknown. The issuing judge, he argues, had no basis upon which to credit this individual's assertions, which had passed through two other persons before reaching the affiant McKinney.

■ Our limited role in evaluating a judge's decision to issue a search warrant is well established:

We review the issuance of a search warrant with "great deference," *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir.1986), to verify that there existed a "substantial basis" for the judicial officer's common-sense determination that, "given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place."

*United States v. Scalia*, 993 F.2d 984, 986 (1st Cir.1993) (quoting *United States v. Caggiano*, 899 F.2d 99, 102 (1st Cir.1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983))). Having conducted such a "totality of the circumstances" scrutiny of the affidavit here, we are satisfied that the issuing judge had substantial support for his finding that "there existed a fair probability that marijuana and related paraphernalia would be found in appellant's residence," *Scalia*, 993 F.2d at 988.

Although the original source of the information leading to the search was anonymous, several factors vouched for the reliability of this person's assertions. Most significant was McKinney's experience and knowledge as a result of his involvement in the 1989 search of Burke's home. The source's information that an individual on Fern Street named John was growing marijuana dovetailed with McKinney's knowledge that marijuana plants had been seized two years earlier from the home of John Burke at 330 Fern Street. The source's further report that "John" had "beat the charge" coincided with McKinney's knowledge that Burke had not been prosecuted as a result of the 1989 seizure. This coincidence of McKinney's knowledge with the source's information served to corroborate that information. *See United States v. Taylor*, 985 F.2d 3, 6 (1st Cir.1993) ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination.")

It also is significant that the source's information was based on personal observation. *See Scalia*, 993 F.2d at 987. This individual had been to Burke's home and reported that it "reeked" of marijuana. *But see United*

---

1. Defendant makes much of the fact that the affidavit reports the informant's conversations with Gastia "in substance" rather than verbatim. Unlike Burke, we do not believe that this phrase suggests that the information provided to the magistrate was unreliable. In our view, McKinney used the phrase to inform the magistrate fully that he was providing what he believed to be a substantively accurate, though not word-for-word, report of the conversations between Gastia and the informant.

*States v. DeLeon,* 979 F.2d 761, 765 (9th Cir.1992) (warrant cannot be based on untrained or inexperienced person's claim to have smelled growing plants that have ·no commonly recognized odor). The source also noted that the house had a new addition, a fact corroborated by McKinney based on both his 1989 search and a drive-by after he received the 1991 tip.

Some weight also attaches to the established record of the confidential informant, through whom the unidentified source communicated to the police officers. According to the affidavit, that informant ("CI# 102") had provided information in the past that led to three felony drug arrests and the seizure of several pounds of marijuana. In addition, McKinney stated that the informant recently had provided information to him and Detective Gastia that was used to secure another search warrant that resulted in discovery of an indoor marijuana cultivating operation.[2]

McKinney's own investigation further corroborated the likelihood that Burke once again was growing marijuana at 330 Fern Street. The power source records he obtained showed that the residents of 330 Fern Street resumed an unusually high consumption of electricity after a lapse in time that coincided with the period immediately following the 1989 search and seizure, when Burke predictably would have been inclined to lie low. McKinney confirmed that the Burkes still lived at 330 Fern Street by checking motor vehicle records for the cars parked there.

■ This confluence of factors was more than ample to establish probable cause. Although the multi-link chain of information began with an unidentified individual, the reliability of that information was reinforced by the proven history of the confidential informant, McKinney's personal knowledge, and the documentary evidence developed

through investigation. The standard of probable cause requires a probability, not a prima facie showing, of criminal activity. *See United States v. Ciampa,* 793 F.2d 19, 22 (1st Cir.1986). Unquestionably, the issuing judge here was given a sufficient basis for concluding that a new crop of marijuana probably was being cultivated at 330 Fern Street.

■ We take a moment to discuss briefly Burke's allegation that the warrant was defective because of a material omission from the affidavit. He claims that McKinney was at least reckless in failing to notify the magistrate that the unidentified source had reported that "John" had "beat the [1989] charge *due to search and seizure problems.*" The affidavit did not give a reason for the lack of prosecution.

The district court held an evidentiary hearing into' Burke's claim that material information had been excluded from the affidavit, concluding that there was "no indication of any kind of deliberate falsehood or reckless disregard of the truth." *See* Tr. of July 16, 1992, at 28. We are satisfied that that court fully explored this issue, and that no basis for invalidating the warrant exists. Any discrepancy between the actual reason for the lack of prosecution in 1989 and the source's explanation is of marginal significance, if any, to the existence of probable cause. In our view, the crucial fact was the lack of prosecution, and on that point, the source and affiant were fully in accord.

## II. *Number of Plants*

Under the Sentencing Guidelines, when an offense involves fifty or more marijuana plants, the court is required to equate each plant with one kilogram of marijuana in determining the defendant's base offense level. *See* U.S.S.G. § 2D1.1. When fewer than fifty

---

**2.** If we were to assign no weight to the reliability of the informant in this context, we would be in the peculiar position of inviting informants to be less forthcoming about their sources. For example, to avoid questions about the unidentified person, the informant could have relayed the information about the Fern Street marijuana operation as if it were the informant's direct knowledge. The issuing judge then would have considered only the informant's veracity and reliability in evaluating the warrant application. In any event, we think that the past history of the informant is relevant and does strengthen the case for the warrant: it suggests not only that the information from the original source is being accurately reported but, as a matter of fact, that the informant has reliable sources.

plants are at issue, the equivalency is 100 grams for each plant.[3]

The district court found that the offense here involved fifty plants, and Burke consequently was sentenced under the harsher one-kilogram-per-plant standard. The court's computation included 32 plants ranging in size from one- to three-and-one-half feet that were found in a large basement room in the new addition and two plants of similar size found in an adjoining smaller room. The court also included 16 one-to-three-inch cuttings, each growing in a separate pot, that were found in the small room.[4]

Burke disputes the district court's calculation. He argues that at least some, and perhaps all, of the 16 small replanted cuttings lacked sufficient root development to be deemed plants. And he emphasizes that an error on just one plant would have a dramatic impact on his sentence because of the 50–plant threshold for the one-kilogram equivalency.

The district court's determination that the 16 cuttings should be classified as plants rests both on a legal determination—what constitutes a "plant" under the guidelines?—and a factual determination—did the cuttings at issue fulfill those requirements? After a careful review of the record and caselaw, we find no reversible error in either respect.

■ The court defined a plant for sentencing purposes as "a cutting with a root formation," Tr. of August 12, at 85. This is consistent with the definition previously accepted by this court, see United States v. McMahon, 935 F.2d 397, 401 (1st Cir.1991) (defining plants as "cuttings with roots"), as well as other courts, see, e.g., United States v. Edge, 989 F.2d 871, 879 (6th Cir.1993) (a marijuana cutting is a "plant" for federal sentencing purposes "if there is readily observable evidence of root formation"); United States v. Bechtol, 939 F.2d 603, 604 (8th Cir.1991) (a cutting with "root hairs"—"fine projections coming from the stem"—is a plant); United States v. Eves, 932 F.2d 856, 859 (10th Cir. 1991) (endorsing holding in United States v. Fitol, 733 F.Supp. 1312, 1315 (D.Minn.1990), that there must be evidence of "'individual growth after the severance, such as growing of roots'"); United States v. Speltz, 733 F.Supp. 1311, 1312 (D.Minn.1990) ("cuttings with roots" are marijuana plants). We see no reason to depart from this relatively straightforward, widely utilized standard.

Indeed, even Burke agrees that the presence of roots is a determinative factor in identifying a plant. He suggests, however, a more functional approach than is reflected by precedent. Based on the testimony presented by his expert at trial, Burke argues that new growth on a cutting may be termed roots—and the cutting identified as a "plant"—only when the growth "physiologically functions as a root." See Brief at 21.

We decline to embrace this functional refinement to the "cuttings with roots" definition. If a cutting has growth extending from its base that is differentiated from its stem or stalk, a court must be permitted to use its eyesight and commonsense to conclude that it has before it a plant with roots. To require a court to determine whether the growth is performing all of the technical functions of roots is to complicate a matter that Congress intended to simplify:

As Judge Devitt noted in [United States v.] Fitol, [733 F.Supp. 1312 (D.Minn.1990)], the legislative purpose was to remedy the problems associated with determining the weight of marijuana—specifically, whether seeds and stems should be weighed in the mix—and to supplant this test with a more

3. The relevant portion of the provision is as follows:

In the case of an offense involving marihuana plants, if the offense involved (A) 50 or more marihuana plants, treat each plant as equivalent to 1 KG of marihuana; (B) fewer than 50 marihuana plants, treat each plant as equivalent to 100 G of marihuana. Provided, however, that if the actual weight of the marihuana is greater, use the actual weight of the marihuana.

4. A total of 36 one-to-three-inch cuttings was found in the small room. Although the court believed that all of these were likely to be plants within the meaning of the Guidelines, the experts who testified at the sentencing hearing had examined only 16 of them. The court therefore decided to give the defendant "the benefit of the doubt" and to exclude the other 20 from his calculation. See Tr. of Aug. 12, 1992, at 86.

simple method; a method providing that the number of "plants regardless of weight" would trigger the mandatory minimum sentence. 733 F.Supp. at 1315. We perceive that the congressional intent was to simplify, not to complicate, the method of determining the high end or low end mandatory sentences. To accept the appellant's formulation would be to turn our face on the legislative purpose.

*Eves,* 932 F.2d at 860 (quoted in *Edge,* 989 F.2d at 878). In our view, plant status is sufficiently established when there is "some readily observable evidence of root formation," *Edge,* 989 F.2d at 877. In other words, at the first sign of roots, a plant exists for sentencing purposes. *Cf. Bechtol,* 939 F.2d at 605 (rejecting viability as the standard for whether a cutting is a plant); *Eves,* 932 F.2d at 857 (same).

■ It is the government's burden to prove, by a preponderance of the evidence, that each of the 16 contested specimens was a plant. *See United States v. Wright,* 873 F.2d 437, 441–42 (1st Cir.1989) (preponderance of the evidence standard applies to sentencing issues). The district court's finding that each had sufficient root development to be classified as a plant may be reversed only for clear error. *See Eves,* 932 F.2d at 859; *United States v. Carlisle,* 907 F.2d 94, 96 (9th Cir.1990) (per curiam).

■ We find no such error. The district court heard extensive testimony from two experts, viewed a videotape of the cuttings taken at the time of the seizure, and examined photographs taken by the defendant's expert after the cuttings had been pulled from their pots and dried. Both experts agreed that the cuttings as viewed in the videotape were healthy and thriving. Both agreed that at least some of the cuttings when examined displayed growth from the base, and that the videotape showed that all 36 specimens in the small room (20 of which the court discounted, *see supra* at n. 4) were of similar height and condition.

With this consensus as a foundation, the district court had ample support for finding that the cuttings all were sufficiently developed to be classified as plants. The government's expert, Dr. Lydon, explicitly testified that the growth on the six to ten cuttings that he personally examined was a form of roots, and he found the remnants of roots in the growing medium from which the cuttings had been removed. He identified roots on 12 of the 16 cuttings shown in the photographs. He further testified that the leaves on the cuttings in the videotape could be as large and healthy as they were only if there existed a root system to sustain them. This was particularly so, he said, because the cuttings were placed under intense light to spur their growth.

Although the defense expert, Professor Colby, contradicted certain of Lydon's testimony, it was within the district court's province to evaluate what it heard and make judgments about the weight to attribute to each expert's views. Colby stated that he saw no plant matter in the rock wool that had contained the cuttings. The court, however, reasonably could credit Lydon's contrary testimony in light of its own ability to see roots on most of the 16 cuttings in Colby's photographs. Similarly, Colby testified that the growth at the base of the cuttings was not roots but simply "primordia," or the precursor of roots to come. In our view, the court properly could reject this characterization of the growth because Colby's testimony primarily focused on when plants have "functional root systems," *see* Tr. of August 6, at 37, rather than on when the first stage of the system manifests.[5]

---

5. Colby testified that the "newly emerging growth" at the base of some of the cuttings was not "roots" because it was not performing the function of roots. Tr. of August 6, at 38. He explained that one of the critical functions of roots—absorbing water—requires root hairs. The root hairs develop on secondary roots, which in turn are formed off of primary roots. *Id.* He further testified:

What we're looking for is a root system. And in order for a plant to be classified as a fully functional living organism ... it's got to have functional root systems, leaf systems and stem systems." *Id.* at 38–39.

In his testimony on the process by which cuttings develop roots, Lydon stated that callus tissue first develops in the spot where roots later will emerge. Tr. of August 12, at 34. In his view, when sufficient tissue develops at that location to be differentiated from the stem, the root system has begun and the specimen may be

Burke makes much of the fact that both Lydon and the district court acknowledged that several of the cuttings in the photographs showed no visible signs of roots. *See* Tr. of August 12, at 47, 52, 67. The testimony, however, clearly permitted the district court to conclude that each of the similarly healthy plants in the videotape must have had the same level of root growth as the six to ten examined by Lydon, and that the inability to see them in the photographs was the result of fuzziness in the pictures or loss of the roots when the cuttings were pulled from the pots and dried.

Two other points highlighted by Burke similarly fail to undermine the district court's finding. Detective McKinney testified that the cuttings continued to grow for several days following their seizure, and Burke suggests that it was only during this time—if at all—that the cuttings developed enough to be termed plants. The district court, however, was free to credit Lydon's contrary testimony that the root development he saw could not have been achieved in just several days. *See* Tr. of August 12, at 16.

Burke also challenges Lydon's reliance on the size and health of the leaves to support his conclusion that the cuttings must have had roots. He notes that the government expert was unable to say unequivocally that Burke had removed all the previously grown large leaves from the cuttings before planting them—the technique typically used by experienced growers. Burke's theory is that, if the leaves as viewed in the videotape were on the plants before the replanting, their size would not be evidence of functioning roots. But Lydon's testimony was not premised solely on the size of the leaves. He saw significant root formation, and primarily relied on the size of the leaves only for his conclusion that the plants he did not personally observe must have had the same root development.

Finally, Burke contends that, at the least, the district court should have reduced the number of plants by 10 percent to reflect the typical failure rate of marijuana cuttings.

This theory, adopted by the court in *United States v. Angell,* 794 F.Supp. 874, 876 (D.Minn.1992), was never presented to the district court, and we decline to consider it for the first time on appeal. *See McMahon,* 935 F.2d at 399–400. Defendant had ample opportunity to develop support for this theory through either of the two experts who testified. On this record, we have no basis for disturbing the district court's calculation.

### III. *Due Process*

■ Burke argues that the equivalency of one plant to one kilogram of marijuana in the Sentencing Guidelines lacks a rational basis and therefore constitutes a violation of due process. This court recently rejected this argument, *see Taylor,* 985 F.2d at 9. Although Burke attempts to distinguish his case because it involves a different and allegedly less productive variety of the marijuana plant, the rationale of *Taylor* is fully applicable. *See id.* ("Congress reasonably may opt for a punitive deterrent against large-scale marijuana manufacturing operations which pose a greater threat than small-scale operations, and warrant exponentially enhanced punishment.") This claim therefore also fails.

*Affirmed.*

OAKES, Senior Circuit Judge, concurring.

While I concur in the majority's carefully reasoned opinion, I do so only because as a visiting judge in this circuit I consider myself bound by this court's prior decisions. These include *United States v. Taylor,* 985 F.2d 3, 9 (1st Cir.1993) (equation of young marijuana plants to kilograms of marijuana rational) and *United States v. McMahon,* 935 F.2d 397, 401 (1st Cir.1991) (same). Were I sitting where I would be free to consider the question solely on its merits, I would conclude that the equation for sentencing purposes of three-inch marijuana plants with at best marginal root structures to kilograms of

defined as a "cutting with roots." This description is consistent with the approach for recognizing roots adopted by the court in *Edge* (callus

tissue is not a root, but small "hair-like projections" are the beginning of a root system). *See* 989 F.2d at 878–79 & nn. 9, 10.

marijuana is arbitrary, irrational and a violation of due process.