UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2057

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN E. BURKE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U.S. District Judge]

Before

Boudin, Circuit Judge,

Coffin and Oakes*, Senior Circuit Judges.

Mark L. Randall with whom Mary A. Davis was on brief for

appellant.
Margaret D. McGaughey, Assistant United States Attorney, with

whom Richard S. Cohen, United States Attorney, and Timothy D. Wing,

Assistant United States Attorney, were on brief for appellee.

August 2, 1993

*Of the Second Circuit, sitting by designation.

COFFIN, Senior Circuit Judge. After the district court

denied his suppression motion, appellant John Burke entered a

conditional guilty plea to a charge that he knowingly

manufactured marijuana in violation of 21 U.S.C. 841(a)(1) and

18 U.S.C. 2. On appeal, he renews his claim that the search

warrant affidavit failed to show probable cause and that,

consequently, evidence seized from his home must be suppressed.

He also claims that the district court erred in calculating his

sentence based on 50 marijuana plants and an equivalency of one

kilogram per plant. We affirm.

I. Probable Cause

In July 1991, Bangor Police Officer Roy McKinney applied for

a warrant to search the home occupied by appellant Burke and his

wife Susan at 330 Fern Street in Bangor, Maine. The affidavit

filed by McKinney in support of the warrant application described

two conversations in which an unidentified individual had

reported to a confidential informant about an indoor marijuana

growing operation. The informant, who had proven reliable in the

past, had passed on the information to a Detective Gastia, who

then passed it on to McKinney.

As reported in the affidavit, the unidentified person made

the following assertions:

(1) A person named "John" was growing 40 marijuana plants in
his house;
(2) The unidentified person had been to John's house, which
was on Fern Street in Bangor, and it "reeked" of marijuana;
(3) The house had a new addition;
(4) A search warrant previously had been executed at John's
house, resulting in the seizure of marijuana plants from an
indoor growing operation;

-2-

(5) John had "beat the charge".
The affidavit also contained the following additional

information from McKinney:1

(6) In 1989, McKinney had executed a warrant at the home of
John Burke, at 330 Fern Street, and uncovered an elaborate indoor
marijuana growing operation;
(7) John Burke had not been prosecuted in connection with
the 1989 seizure;
(8) 330 Fern Street had a new addition;
(9) Two cars parked at 330 Fern Street on June 19, 1991,
were identified through Department of Motor Vehicle records as
belonging to Susan and John Burke, of 330 Fern Street;
(10) Power consumption records for 330 Fern Street revealed
a pattern of usage consistent with indoor marijuana cultivation,
with a dramatic drop in usage following the 1989 search and
substantial increases beginning again in the fall of 1990.

Burke contends that this affidavit was deficient and that

the warrant therefore was invalid. His primary complaint is that

the central information in the affidavit comes from an

unidentified person whose reliability and credibility are

untested and unknown. The issuing judge, he argues, had no basis

upon which to credit this individual's assertions, which had

passed through two other persons before reaching the affiant

McKinney.

Our limited role in evaluating a judge's decision to issue a

search warrant is well established:

We review the issuance of a search warrant with
"great deference," United States v. Ciampa, 793 F.2d

19, 22 (1st Cir. 1986), to verify that there existed a

1 Defendant makes much of the fact that the affidavit reports the
informant's conversations with Gastia "in substance" rather than
verbatim. Unlike Burke, we do not believe that this phrase
suggests that the information provided to the magistrate was
unreliable. In our view, McKinney used the phrase to inform the
magistrate fully that he was providing what he believed to be a
substantively accurate, though not word-for-word, report of the
conversations between Gastia and the informant.

-3-

"substantial basis" for the judicial officer's common-
sense determination that, "given all the circumstances
set forth in the affidavit . . . , including the
`veracity' and `basis of knowledge' of persons
supplying hearsay information, there [was] a fair
probability that contraband or evidence of a crime
[would] be found in a particular place."

United States v. Scalia, No. 93-1018, slip op. at 4 (1st Cir. May

21, 1993) (quoting United States v. Caggiano, 899 F.2d 99, 102

(1st Cir. 1990) (quoting Illinois v. Gates, 462 U.S. 213, 238-39

(1983))). Having conducted such a "totality of the

circumstances" scrutiny of the affidavit here, we are satisfied

that the issuing judge had substantial support for his finding

that "there existed a fair probability that marijuana and related

paraphernalia would be found in appellant's residence," Scalia,

slip op. at 8-9. Although the original source of the information

leading to the search was anonymous, several factors vouched for

the reliability of this person's assertions. Most significant

was McKinney's experience and knowledge as a result of his

involvement in the 1989 search of Burke's home. The source's

information that an individual on Fern Street named John was

growing marijuana dovetailed with McKinney's knowledge that

marijuana plants had been seized two years earlier from the home

of John Burke at 330 Fern Street. The source's further report

that "John" had "beat the charge" coincided with McKinney's

knowledge that Burke had not been prosecuted as a result of the

1989 seizure. This coincidence of McKinney's knowledge with the

source's information served to corroborate that information. See

United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ("An

-4-

affiant's knowledge of the target's prior criminal activity or

record clearly is material to the probable cause determination.")

It also is significant that the source's information was

based on personal observation. See Scalia, slip op. at 7. This

individual had been to Burke's home and reported that it "reeked"

of marijuana. But see United States v. DeLeon, 979 F.2d 761, 765

(9th Cir. 1992) (warrant cannot be based on untrained or

inexperienced person's claim to have smelled growing plants that

have no commonly recognized odor). The source also noted that

the house had a new addition, a fact corroborated by McKinney

based on both his 1989 search and a drive-by after he received

the 1991 tip.

Some weight also attaches to the established record of the

confidential informant, through whom the unidentified source

communicated to the police officers. According to the affidavit,

that informant ("CI#102") had provided information in the past

that led to three felony drug arrests and the seizure of several

pounds of marijuana. In addition, McKinney stated that the

informant recently had provided information to him and Detective

Gastia that was used to secure another search warrant that

resulted indiscovery ofan indoor marijuanacultivating operation.2

2 If we were to assign no weight to the reliability of the
informant in this context, we would be in the peculiar position
of inviting informants to be less forthcoming about their
sources. For example, to avoid questions about the unidentified
person, the informant could have relayed the information about
the Fern Street marijuana operation as if it were the informant's
direct knowledge. The issuing judge then would have considered
only the informant's veracity and reliability in evaluating the
warrant application. In any event, we think that the past

-5-

McKinney's own investigation further corroborated the

likelihood that Burke once again was growing marijuana at 330

Fern Street. The power source records he obtained showed that

the residents of 330 Fern Street resumed an unusually high

consumption of electricity after a lapse in time that coincided

with the period immediately following the 1989 search and

seizure, when Burke predictably would have been inclined to lie

low. McKinney confirmed that the Burkes still lived at 330 Fern

Street by checking motor vehicle records for the cars parked

there.

This confluence of factors was more than ample to establish

probable cause. Although the multi-link chain of information

began with an unidentified individual, the reliability of that

information was reinforced by the proven history of the

confidential informant, McKinney's personal knowledge, and the

documentary evidence developed through investigation. The

standard of probable cause requires a probability, not a prima

facie showing, of criminal activity. See United States v.

Ciampa, 793 F.2d 19, 22 (1st Cir. 1986). Unquestionably, the

issuing judge here was given a sufficient basis for concluding

that a new crop of marijuana probably was being cultivated at 330

Fern Street.

history of the informant is relevant and does strengthen the case
for the warrant: it suggests not only that the information from
the original source is being accurately reported but, as a matter
of fact, that the informant has reliable sources.

-6-

We take a moment to discuss briefly Burke's allegation that

the warrant was defective because of a material omission from the

affidavit. He claims that McKinney was at least reckless in

failing to notify the magistrate that the unidentified source had

reported that "John" had "beat the [1989] charge due to search

and seizure problems." The affidavit did not give a reason for

the lack of prosecution.

The district court held an evidentiary hearing into Burke's

claim that material information had been excluded from the

affidavit, concluding that there was "no indication of any kind

of deliberate falsehood or reckless disregard of the truth." See

Tr. of July 16, 1992, at 28. We are satisfied that that court

fully explored this issue, and that no basis for invalidating the

warrant exists. Any discrepancy between the actual reason for

the lack of prosecution in 1989 and the source's explanation is

of marginal significance, if any, to the existence of probable

cause. In our view, the crucial fact was the lack of

prosecution, and on that point, the source and affiant were fully

in accord.

II. Number of Plants

Under the Sentencing Guidelines, when an offense involves

fifty or more marijuana plants, the court is required to equate

each plant with one kilogram of marijuana in determining the

defendant's base offense level. See U.S.S.G. 2D1.1. When

-7-

fewer than fifty plants are at issue, the equivalency is 100

grams for each plant.3

The district court found that the offense here involved

fifty plants, and Burke consequently was sentenced under the

harsher one-kilogram-per-plant standard. The court's computation

included 32 plants ranging in size from one- to three-and-one-

half feet that were found in a large basement room in the new

addition and two plants of similar size found in an adjoining

smaller room. The court also included 16 one-to-three-inch

cuttings, each growing in a separate pot, that were found in the

small room.4

Burke disputes the district court's calculation. He argues

that at least some, and perhaps all, of the 16 small replanted

cuttings lacked sufficient root development to be deemed plants.

And he emphasizes that an error on just one plant would have a

3 The relevant portion of the provision is as follows:

In the case of an offense involving marihuana
plants, if the offense involved (A) 50 or more
marihuana plants, treat each plant as equivalent to 1
KG of marihuana; (B) fewer than 50 marihuana plants,
treat each plant as equivalent to 100 G of marihuana.
Provided, however, that if the actual weight of the
marihuana is greater, use the actual weight of the
marihuana.

4 A total of 36 one-to-three-inch cuttings was found in the small
room. Although the court believed that all of these were likely
to be plants within the meaning of the Guidelines, the experts
who testified at the sentencing hearing had examined only 16 of
them. The court therefore decided to give the defendant "the
benefit of the doubt" and to exclude the other 20 from his
calculation. See Tr. of Aug. 12, 1992, at 86.

-8-

dramatic impact on his sentence because of the 50-plant threshold

for the one-kilogram equivalency.

The district court's determination that the 16 cuttings

should be classified as plants rests both on a legal

determination -- what constitutes a "plant" under the guidelines?

-- and a factual determination -- did the cuttings at issue

fulfill those requirements? After a careful review of the record

and caselaw, we find no reversible error in either respect.

The court defined a plant for sentencing purposes as "a

cutting with a root formation," Tr. of August 12, at 85. This is

consistent with the definition previously accepted by this court,

see United States v. McMahon, 935 F.2d 397, 401 (1st Cir. 1991)

(defining plants as "cuttings with roots"), as well as other

courts, see, e.g., United States v. Edge, 989 F.2d 871, 879 (6th

Cir. 1993) (a marijuana cutting is a "plant" for federal

sentencing purposes "if there is readily observable evidence of

root formation"); United States v. Bechtol, 939 F.2d 603, 604

(8th Cir. 1991) (a cutting with "root hairs" -- "fine projections

coming from the stem" -- is a plant); United States v. Eves, 932

F.2d 856, 859 (10th Cir. 1991) (endorsing holding in United

States v. Fitol, 733 F. Supp. 1312, 1315 (D. Minn. 1990), that

there must be evidence of "`individual growth after the

severance, such as growing of roots'"); United States v. Speltz,

733 F. Supp. 1311, 1312 (D. Minn. 1990) ("cuttings with roots"

are marijuana plants). We see no reason to depart from this

relatively straightforward, widely utilized standard.

-9-

Indeed, even Burke agrees that the presence of roots is a

determinative factor in identifying a plant. He suggests,

however, a more functional approach than is reflected by

precedent. Based on the testimony presented by his expert at

trial, Burke argues that new growth on a cutting may be termed

roots -- and the cutting identified as a "plant" -- only when the

growth "physiologically functions as a root." See Brief at 21.

We decline to embrace this functional refinement to the

"cuttings with roots" definition. If a cutting has growth

extending from its base that is differentiated from its stem or

stalk, a court must be permitted to use its eyesight and

commonsense to conclude that it has before it a plant with roots.

To require a court to determine whether the growth is performing

all of the technical functions of roots is to complicate a matter

that Congress intended to simplify:

As Judge Devitt noted in [United States v.] Fitol, [733

F. Supp. 1312 (D. Minn. 1990)], the legislative purpose
was to remedy the problems associated with determining
the weight of marijuana -- specifically, whether seeds
and stems should be weighed in the mix -- and to
supplant this test with a more simple method; a method
providing that the number of "plants regardless of
weight" would trigger the mandatory minimum sentence.
733 F. Supp. at 1315. We perceive that the
congressional intent was to simplify, not to
complicate, the method of determining the high end or
low end mandatory sentences. To accept the appellant's
formulation would be to turn our face on the
legislative purpose.

Eves, 932 F.2d at 860 (quoted in Edge, 989 F.2d at 878). In our

view, plant status is sufficiently established when there is

"some readily observable evidence of root formation," Edge, 989

F.2d at 877. In other words, at the first sign of roots, a plant

-10-

exists for sentencing purposes. Cf. Bechtol, 939 F.2d at 605

(rejecting viability as the standard for whether a cutting is a

plant); Eves, 932 F.2d at 857 (same).

It is the government's burden to prove, by a preponderance

of the evidence, that each of the 16 contested specimens was a

plant. See United States v. Wright, 873 F.2d 437, 441-42 (1st

Cir. 1989) (preponderance of the evidence standard applies to

sentencing issues). The district court's finding that each had

sufficient root development to be classified as a plant may be

reversed only for clear error. See Eves, 932 F.2d at 859; United

States v. Carlisle, 907 F.2d 94, 96 (9th Cir. 1990) (per curiam).

We find no such error. The district court heard extensive

testimony from two experts, viewed a videotape of the cuttings

taken at the time of the seizure, and examined photographs taken

by the defendant's expert after the cuttings had been pulled from

their pots and dried. Both experts agreed that the cuttings as

viewed in the videotape were healthy and thriving. Both agreed

that at least some of the cuttings when examined displayed growth

from the base, and that the videotape showed that all 36

specimens in the small room (20 of which the court discounted,

see supra at n.4) were of similar height and condition.

With this consensus as a foundation, the district court had

ample support for finding that the cuttings all were sufficiently

developed to be classified as plants. The government's expert,

Dr. Lydon, explicitly testified that the growth on the six to ten

cuttings that he personally examined was a form of roots, and he

-11-

found the remnants of roots in the growing medium from which the

cuttings had been removed. He identified roots on 12 of the 16

cuttings shown in the photographs. He further testified that the

leaves on the cuttings in the videotape could be as large and

healthy as they were only if there existed a root system to

sustain them. This was particularly so, he said, because the

cuttings were placed under intense light to spur their growth.

Although the defense expert, Professor Colby, contradicted

certain of Lydon's testimony, it was within the district court's

province to evaluate what it heard and make judgments about the

weight to attribute to each expert's views. Colby stated that he

saw no plant matter in the rock wool that had contained the

cuttings. The court, however, reasonably could credit Lydon's

contrary testimony in light of its own ability to see roots on

most of the 16 cuttings in Colby's photographs. Similarly, Colby

testified that the growth at the base of the cuttings was not

roots but simply "primordia," or the precursor of roots to come.

In our view, the court properly could reject this

characterization of the growth because Colby's testimony

primarily focused on when plants have "functional root systems,"

see Tr. of August 6, at 37, rather than on when the first stage

of the system manifests.5

5 Colby testified that the "newly emerging growth" at the base of
some of the cuttings was not "roots" because it was not
performing the function of roots. Tr. of August 6, at 38. He
explained that one of the critical functions of roots --
absorbing water -- requires root hairs. The root hairs develop
on secondary roots, which in turn are formed off of primary
roots. Id. He further testified:

-12-

Burke makes much of the fact that both Lydon and the

district court acknowledged that several of the cuttings in the

photographs showed no visible signs of roots. See Tr. of August

12, at 47, 52, 67. The testimony, however, clearly permitted the

district court to conclude that each of the similarly healthy

plants in the videotape must have had the same level of root

growth as the six to ten examined by Lydon, and that the

inability to see them in the photographs was the result of

fuzziness in the pictures or loss of the roots when the cuttings

were pulled from the pots and dried.

Two other points highlighted by Burke similarly fail to

undermine the district court's finding. Detective McKinney

testified that the cuttings continued to grow for several days

following their seizure, and Burke suggests that it was only

during this time -- if at all -- that the cuttings developed

enough to be termed plants. The district court, however, was

free to credit Lydon's contrary testimony that the root

What we're looking for is a root system. And in order
for a plant to be classified as a fully functional
living organism . . . it's got to have functional root
systems, leaf systems and stem systems." Id. at 38-39.

In his testimony on the process by which cuttings develop
roots, Lydon stated that callus tissue first develops in the spot
where roots later will emerge. Tr. of August 12, at 34. In his
view, when sufficient tissue develops at that location to be
differentiated from the stem, the root system has begun and the
specimen may be defined as a "cutting with roots." This
description is consistent with the approach for recognizing roots
adopted by the court in Edge (callus tissue is not a root, but

small "hair-like projections" are the beginning of a root
system). See 989 F.2d at 878-79 & nn.9, 10.

-13-

development he saw could not have been achieved in just several

days. See Tr. of August 12, at 16.

Burke also challenges Lydon's reliance on the size and

health of the leaves to support his conclusion that the cuttings

must have had roots. He notes that the government expert was

unable to say unequivocally that Burke had removed all the

previously grown large leaves from the cuttings before planting

them -- the technique typically used by experienced growers.

Burke's theory is that, if the leaves as viewed in the videotape

were on the plants before the replanting, their size would not be

evidence of functioning roots. But Lydon's testimony was not

premised solely on the size of the leaves. He saw significant

root formation, and primarily relied on the size of the leaves

only for his conclusion that the plants he did not personally

observe must have had the same root development.

Finally, Burke contends that, at the least, the district

court should have reduced the number of plants by 10 percent to

reflect the typical failure rate of marijuana cuttings. This

theory, adopted by the court in United States v. Angell, 794 F.

Supp. 874, 876 (D. Minn. 1992), was never presented to the

district court, and we decline to consider it for the first time

on appeal. See McMahon, 935 F.2d at 399-400. Defendant had

ample opportunity to develop support for this theory through

either of the two experts who testified. On this record, we have

no basis for disturbing the district court's calculation.

III. Due Process

-14-

Burke argues that the equivalency of one plant to one

kilogram of marijuana in the Sentencing Guidelines lacks a

rational basis and therefore constitutes a violation of due

process. This court recently rejected this argument, see Taylor,

985 F.2d at 9. Although Burke attempts to distinguish his case

because it involves a different and allegedly less productive

variety of the marijuana plant, the rationale of Taylor is fully

applicable. See id. ("Congress reasonably may opt for a punitive

deterrent against large-scale marijuana manufacturing operations

which pose a greater threat than small-scale operations, and

warrant exponentially enhanced punishment.") This claim

therefore also fails.

Affirmed.

Concurrence follows.

-15-

OAKES, Senior Circuit Judge, concurring. While I concur in

the majority's carefully reasoned opinion, I do so only because

as a visiting judge in this circuit I consider myself bound by

this court's prior decisions. These include United States v.

Taylor, 985 F.2d 3, 9 (1st Cir. 1993) (equation of young

marijuana plants to kilograms of marijuana rational) and United

States v. McMahon, 935 F.2d 397, 401 (1st Cir. 1991) (same).

Were I sitting where I would be free to consider the question

solely on its merits, I would conclude that the equation for

sentencing purposes of three-inch marijuana plants with at best

marginal root structures to kilograms of marijuana is arbitrary,

irrational and a violation of due process.

-16-