**UNITED STATES of America**

v.

**Roscoe B. SARGENT, Defendant**

No. 01–CR–14–B–S.

United States District Court,
D. Maine.

July 12, 2001.

Timothy D. Wing, Assistant United States Attorney, U.S. Attorney's Office, Bangor, ME, for U.S.

Brett D. Baber, Baber & Weeks, Bangor, ME, for defendant.

## ORDER MODIFYING THE RECOMMENDED DECISION

SINGAL, District Judge.

On May 31, 2001, the Court issued an Order (Docket # 11) affirming the Magistrate Judge's Recommended Decision (Docket # 7) to deny Defendant's Motion to Suppress Evidence (Docket # 4). In light of a new First Circuit opinion, *United States v. Brown,* 251 F.3d 286, 293 (1st Cir.2001), the Court issued an Order (Docket # 14) asking the parties to file supplemental briefs regarding how the *Brown* ruling affects the merits of Defendant's arguments and whether the Court could and/or should reopen the factual record and receive additional evidence. Neither party has requested that the Court reopen the factual record.

Based on the parties' supplemental memoranda and the Court's interpretation of *Brown,* the Court withdraws its prior Order affirming the Recommended Decision and in its place issues this Order Modifying the Recommended Decision. *See, e.g., United States v. Lachman,* 48 F.3d 586, 594 (1st Cir.1995) ("Within very broad limits, the district court is free to reexamine its position on any issue as the case develops."). Based on the discussion below, the Court GRANTS Defendant's Motion to Suppress Evidence.

## I. FINDINGS OF FACT

On December 29, 2000, Special Agent Andrew Miller of the Maine Drug En-

forcement Agency ("MDEA") filed an "Affidavit and Request for Search Warrant" (Docket # 5, Attach.) with the State District Court located in Bangor, Maine, pursuant to Me. R.Crim. P. 41. The affidavit describes how, through a confidential informant, Miller had probable cause to know that Defendant Roscoe Sargent was selling narcotics, specifically marijuana and hallucinogenic mushrooms, out of his residence. The affidavit requested a daytime search warrant of Sargent's home and person. Miller did not ask for a no-knock warrant.

The affidavit and request provides no information regarding the possibility of weapons being present at Sargent's home. Miller, however, testified at the suppression hearing that prior to requesting a search warrant, he had reason to believe that Sargent's home contained a large number of knives, dispersed throughout his small, two-room apartment.[1] Even though the evidence presented at the hearing demonstrated that the police knew that Sargent possessed numerous bladed weapons and had easy access to them, no evidence indicated that Sargent had a violent disposition or otherwise was likely to do violence with those knives.

During the evening of the same day, December 29, 2000, Miller and several other police officers executed the search warrant. Accompanying Miller was Bangor Police Officer Gregory Sproul, a member of the Bangor Special Tactical Team. The role of the Tactical Team was "to make the entry, secure the premises and the people within the residence, and then turn it over to the MDEA," who presumably would search for illegal narcotics pursuant to the search warrant. (Tr. p. 8–9 (Docket # 9).) At about 8:30 p.m., the group of police officers arrived at Sargent's apartment building, entered it, and proceeded down a hallway toward Sargent's unit.

Sproul testified that upon reaching Sargent's apartment door, both he and another Tactical Team officer, John Heitmann, announced their presence by yelling words to the effect of, "Bangor police, search warrant, open the door." (Tr. p. 9, l.16.) At the same time, they knocked on the apartment door. The police officers then waited approximately five seconds. Sproul testified that he thought that five seconds was an appropriate amount of time to wait because he had "safety concerns" (Tr. p. 10, l.13), and because he had not heard anyone making any motion to comply with their request to open the door. After the five second delay, Officer Sproul gestured to the "breaching man," Officer Al Hayden, who then smashed in the apartment door with a single strike of a battering ram. Thereafter, officers entered the apartment and found Sargent near the doorway. Upon searching the apartment, the police uncovered a cache of marijuana and psilocybin mushrooms, as well as multiple knives and a shotgun.

Sargent and his girlfriend, Heather Fliegelman, both testified that they had been sitting inside Sargent's small apartment's front room when they heard "a lot of racket out in the hallway." (Tr. p. 19, l.21.) Sargent rose out of his chair to investigate the noise. As he approached the apartment door, Sargent heard the police officers announcing their presence. Sargent testified that "I hollered that I was opening the door, and I got the door unlocked, but I didn't have a chance to even turn the doorknob because they smashed the door in without giving me a chance." (Tr. 20,

---

1. Agent Miller testified, "The intelligence that I had received was that anywhere that Mr. Sargent was in the apartment that he could put his hand on a knife." (Tr. p. 29, ll, 14–16 (Docket # 9).)

ll.1–4.) Apparently, Sproul did not hear Sargent declare that he was in the process of opening the door.

## II. DISCUSSION

When police officers have probable cause to search a home, and they have a reasonable suspicion that searching that residence poses a risk to human safety or a risk that evidence will be destroyed, the police may request a so-called "no-knock" search warrant which authorizes police officers to enter a home without pausing to knock on the front door or to announce their presence. *See, e.g., Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997). Unless the police have obtained and are executing a no-knock warrant, police officers generally must "knock and announce" themselves prior to entering a residence. *See, e.g., Wilson v. Arkansas*, 514 U.S. 927, 929, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995).

In the present case, the police neither asked for nor received a no-knock warrant. Defendant argues that the police officers violated his Fourth Amendment rights because when they arrived to search his apartment, they did not make a legitimate knock-and-announce entrance. Rather, Defendant contends that by delaying only five seconds, the police made a de facto no-knock entry. The Government responds by arguing (1) that it was not a de facto no-knock entry, rather that the police performed a valid knock-and-announce entrance, and (2) that even if the Court treats the police officers' actions as a de facto no-knock entry, it was justified because of exigent circumstances.

### A. No–Knock Warrants

The requirement that police officers knock and announce themselves prior to entering a residence is grounded in the Fourth Amendment's protection against unreasonable searches. The knock-and-announce requirement

> serves several worthwhile purposes: (i) it decreases the potential for violence, as an unannounced breaking and entering into a home could quite easily lead an individual to believe that his safety was in peril and cause him to take defensive measures; (ii) it protects privacy by minimizing the chance of entry of the wrong premises and subjecting innocent persons to the shock, fright or embarrassment attendant upon an unannounced police intrusion, and even when there is no mistake, allows those within a brief time to prepare for the police entry; and (iii) it prevents the physical destruction of property by giving the occupant the opportunity to voluntarily admit the officer into his home.

Wayne LaFave, Jerold Israel & Nancy King, *Criminal Procedure* § 3.4(h) (1999) (internal quotations and footnotes omitted). "The Fourth Amendment, reflecting the long common law tradition protecting the sanctity of the home, includes a general presumption that police officers executing a search warrant for a residence must announce their presence and authority before entering." *United States v. Moore*, 91 F.3d 96, 98 (10th Cir.1996) (citing *Wilson*, 514 U.S. at 934, 115 S.Ct. 1914 (stating that there is a "presumption in favor of announcement")). Although police generally must knock and announce prior to executing a search warrant, there are two exceptions: if the police have obtained a no-knock warrant, or if exigent circumstances arise.

In the instant case, it appears that if the police had included in the warrant application information regarding Defendant's possession of numerous knives and the likelihood that evidence would be destroyed, the State court judge may have issued a no-knock warrant to the police.

*See, e.g.,* Me. R.Crim. P. 41(i). At the time of the application, the police had information indicating that Sargent had many knives.

Special Agent Miller, however, testified that he simply did not have enough time to seek a no-knock warrant. The Court, however, finds this to be a poor excuse: taking the extra step of petitioning the State court for a no-knock warrant would have required writing one or two additional sentences on the application (Agent Miller typed three pages of text for his affidavit) and placing a check mark in the box beside the statement "I request that a search warrant be issued which may be served without providing notice of the officer's purpose and office." (Affidavit and Request for Search Warrant at 6 (Docket # 5, Attach.).) Demanding this type of meticulousness from police officers is not a technicality designed to impede law enforcement efforts. Rather, requiring police officers to request permission prior to conducting a no-knock search ensures that a neutral magistrate reviews the facts of the case and agrees that the situation merits a no-knock entry. The solemn role of the judge is to balance an individual's Fourth Amendment privacy rights against the potential overzealousness of police officers.

**B. Whether the Entry Was a De Facto "No–Knock" Entry**

■ The police officers did not seek or obtain a no-knock warrant, but Defendant argues that they acted as if they had one. The police waited five seconds. Officer Sproul testified that five seconds was a sufficient amount of time because the officers knew that the apartment was "very small." (Tr. 8, 1.9.) Apparently, he assumed that because the apartment was so small, someone should have come to the door within five seconds. Also, he did not hear any sound through the door, suggesting that no one was responding to the police officers' demands.

The common law does not prescribe a precise rule as to how long a police officer must wait after knocking and announcing before he may enter a residence. Courts rely on the Fourth Amendment's standard of reasonableness when determining whether a search passes constitutional muster. *See, e.g., United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). Therefore, the question is whether or not the police waited a reasonable amount of time before forcibly entering Defendant's apartment. *See, e.g., United States v. Dice,* 200 F.3d 978, 983 (6th Cir.2000). In other words, the Court must determine whether the police gave Defendant a reasonable opportunity to open the door. *See id.* at 981. If the occupants of a residence do not admit the police officers within a reasonable period of time, then it can be assumed that the occupants constructively have refused admittance and then the police may enter the home, by force if necessary. *See Moore,* 91 F.3d at 97.

Absent exigent circumstances, "a delay of five-seconds or less after knocking and announcing has been held" to be an unreasonably short period of time. *See United States v. Jones,* 133 F.3d 358, 361 (5th Cir.1998) (collecting cases).[2] The Govern-

2. In *Jones,* the Fifth Circuit discussed 18 U.S.C. § 3109, a federal statute that limits how federal law enforcement agents conduct no-knock entries. *See* 133 F.3d at 361. When analyzing entries made by state law enforcement officers, federal courts often "use § 3109 as a guide in conducting the 'reasonableness' inquiry dictated by the Fourth Amendment." *See, e.g., Moore,* 91 F.3d at 98. *Jones* points out that section 3109 tends to restrict police conduct more than the

ment argues that Officer Sproul heard no one approaching the door, implying that his shouts were being ignored.[3] Sproul, however, acknowledged that after the police entered the apartment, he saw that Defendant was near the apartment's front door, supporting Defendant's testimony that he had been walking toward the door to open it. The Court finds that even in a very small apartment, five seconds is a short period of time for someone to realize that law enforcement officers are at his or her front door, to stand up, to walk to that door, and to open it. The Court concludes that it was not reasonable for the police to enter Defendant's apartment after a wait of only five seconds. *See, e.g., United States v. Lucht,* 18 F.3d 541, 550–51 (8th Cir.1994). The Court agrees with Defendant that the entry was a de facto "no-knock" entry.

## C. Exigent Circumstances

■ Even if the police failed to wait a reasonable amount of time after knocking, that does not end the inquiry. If the Government can show that exigent circumstances supported a rapid entry, then the search was reasonable. The Government argues that there were exigent circumstances related to safety concerns because the police knew that Defendant possessed a large number of knives, scattered throughout the residence.[4] According to a recent First Circuit decision, however, this fact alone does not justify entering Defendant's apartment before waiting a reason-

able amount of time. *See United States v. Brown,* 251 F.3d 286, 293 (1st Cir.2001).

In *Brown,* the court held that the police were not justified to make a no-knock entry based only on knowledge that the criminal suspect possessed weapons without additional facts suggesting that the suspect was likely to use those weapons against the police or other persons. *See id.* The court noted that

> [w]ithout apparent exception, our cases have involved not only evidence of the *presence* of weapons at the dwelling to be searched, but also evidence supporting an inference that the target of the search might actually use them.

*Id.* (listing First Circuit opinions) (emphasis in original). In the present case, no evidence was presented that Defendant had any propensity to use his numerous knives against people. Many people own more than one knife, and even though Defendant may have kept knives in easily accessible locations in both rooms of his small apartment, that does not lead to the conclusion that he was a violent person likely to wield his knives as weapons against police officers or others.

Moreover, the present situation is not the usual set of circumstances supporting a finding of exigent circumstances. Historically, courts tend to find that exigent circumstances justify entry into a home without delay because between the time that the knock-and-announce warrant was issued and the time that the police enter the premises, critical new events have oc-

Fourth Amendment's reasonableness standard does. *See* 133 F.3d at 361.

**3.** Conversely, in *United States v. Mendonsa,* 989 F.2d 366 (9th Cir.1993), the Government argued unsuccessfully that because the police officers heard non-descript noises from the interior of a residence, they were justified to forcibly enter the home after a wait of only three to five seconds. *See id.* at 370.

**4.** The Government does not argue that the potential destruction of evidence presented an exigent condition. In fact, during the suppression hearing, the Government seemed to concede that marijuana and mushrooms are not as easy to destroy as other drugs, such as cocaine. (*See* Tr. p. 35, ll, 14–22.)

curred. *See, e.g., Mensh v. Dyer,* 956 F.2d 36, 40 (4th Cir.1991) (delay of only a few seconds between knock and entry justified because police heard the sound of someone running); *McClure v. United States,* 332 F.2d 19, 21–22 (9th Cir.1964) (four to five second wait was sufficient because police heard footsteps running away from the door). In the instant case, no new facts had come to light. Prior to requesting the search warrant, the police knew that Defendant allegedly owned numerous knives. Between the time that Agent Miller obtained the knock-and-announce warrant and the moment that the police officers rammed in the Defendant's door, no new events had occurred that justified a no-knock entrance. Indeed, the police testified that they heard no sounds emanating from Defendant's apartment.

Applying *Brown* to the facts of this case, the Court finds that exigent circumstances did not justify the police executing a de facto no-knock entry. The Court finds that the police acted unreasonably when entering Defendant's residence after a delay of only five seconds, and therefore the evidence collected should be suppressed.

## III. CONCLUSION

The Court withdraws its prior Order (Docket # 11) which affirmed the Recommended Decision, and replaces it with this Order Modifying the Recommended Decision. Based on the foregoing, the Court GRANTS Defendant's Motion to Suppress Evidence (Docket # 4).

SO ORDERED.