**UNITED STATES of America,**

v.

**Eric HOLMES, Defendant.**

**No. CR. 01–48–P–C.**

United States District Court, D. Maine.

Dec. 11, 2001.

---

Leonard I. Sharon, Sharon, Leary & Detroy, Auburn, ME, for Eric Holmes.

Jonathan R. Chapman, Office of the U.S. Attorney, Portland, ME, for U.S.

## MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

The Court now has before it Defendant's Motion to Suppress, in which he seeks

suppression of all evidence seized from his residence and any evidence derived from the search of his residence on April 12, 2001. Docket No. 15 (Motion to Dismiss), Docket No. 16 (Memorandum in Support of Motion to Dismiss), Docket No. 27 (Post–Hearing Brief in Support of Motion to Dismiss), Docket No. 29 (Reply Brief in Support of Motion to Suppress Evidence). Specifically, Defendant argues that the use of information illegally obtained by a thermal imaging scan to procure the search warrant renders the search based on that warrant invalid. After redacting the information obtained from the thermal imaging device, Defendant further contends that the warrant application did not establish probable cause. Defendant also argues that the search warrant was unconstitutionally executed in violation of Fourth Amendment "knock and announce" requirements. The Government opposes the motion, arguing that even without the thermal imaging data, the warrant application contained sufficient evidence for the judge to have found probable cause. Alternatively, the Government argues that the use of a thermal imaging device was a good-faith exception to the exclusionary rule. With respect to Defendant's execution argument, the Government contends that the warrant was constitutionally executed because the officers' failure to wait longer than a few seconds before entering the premises was "reasonable" under the circumstances. *See* Government's Post–Hearing Brief at 1.

## I. FACTS

Special Agent Thomas Slivinski of the Maine Drug Enforcement Agency (MDEA) submitted an Affidavit and Request for a Search Warrant on April 12, 2001, containing the following information. A cooperating defendant in a marijuana trafficking case ("CD # 1") provided information to Maine Drug Enforcement Agent Gerry Baril pertaining to the indoor cultivation of marijuana at 60 Academy Street in Auburn, Maine by an individual named Eric Holmes. CD # 1 reported personal conversations during December 2000 with an unidentified individual ("UI # 1") who claimed to have obtained marijuana from, and smoked marijuana with, Eric Holmes at his residence at 60 Academy Street. CD # 1 also relayed information obtained from another unidentified individual, a so-called mutual friend of CD # 1 and Eric Holmes ("Friend"), who claimed to have been at the Holmes residence in December 2000 and to have witnessed a large grow operation. Both UI # 1 and Friend allegedly told CD # 1 that Holmes was cultivating and selling marijuana from his single-family residence where he lived with his wife Carol Holmes, who was not allegedly involved in the cultivation activity inside the residence. Friend allegedly told CD # 1 that Eric Holmes was using several high-intensity discharge grow lights, which were mounted on motorized tracks for automated movement over the marijuana plants that they were illuminating, and carbon dioxide gas to enrich the grow room environment for better plant growth. On or about January 4 or 5, 2001, CD # 1 reported that CD # 1 and Friend drove together to Eric Holmes' residence in Auburn, and CD # 1 watched Friend enter a blue, single-family residence across from 61 Academy Street (later identified as 60 Academy Street) for a brief stay. Friend allegedly returned and told CD # 1 that Holmes had just harvested a crop of indoor-grown marijuana plants at his home some time during December 2000 and had several big bags of processed marijuana stored in the house. Agent Baril determined that Eric Holmes lived at that address with his wife, Carol Holmes, and that Eric Holmes was a felon, who had been convicted and sentenced in 1989 to

ninety days in jail and five years probation for possession of narcotics, and convicted in 1988 and sentenced to three years probation for strong-arm robbery. An investigation was then commenced by the MDEA. Attempted trash pulls[1] were unsuccessful. Special Agent Kate Bernard of the United States Drug Enforcement Agency ("DEA") subpoenaed power records for periods of time between December 1998 and March 2001, which were analyzed by Special Agent Tony L. Milligan of the MDEA.

Agent Milligan also submitted an affidavit on April 12, 2001, containing the following information. After viewing the residence at 60 Academy Street, Agent Milligan could not determine the source of heating. Agent Milligan analyzed power consumption records from December 1998 to March 2001 for 60 Academy Street and found the average consumption rate to be 1,906 kilowatt hours (kWh) per month, or 63 kWh per day, which is more than twice the national average. He found the lowest monthly consumption to be 725 kWh, recorded in April 1999, and the highest to be 2,638 kWh, recorded in February 2001. He noted what he called "distinct cycles" during the highest power consumption peaks, including that the consumption was high but relatively uniform from December 1998 to February 2000; however, in March 2000, the consumption doubled from 40 kWh per day to 81 kWh per day. In his affidavit, Agent Milligan described a typical grow cycle for indoor marijuana,

which is three months, and attached power consumption charts. The affiant claims that four such cycles occurred from March 2000 to May 2000, July 2000 to October 2000, November 2000 to January 2001, and February 2001 to April 2001.

On April 10, 2001, Agents Milligan and Slivinski conducted a thermal imaging scan of the Holmes residence at 60 Academy Street in reliance on *United States v. Woodward,* 154 F.Supp.2d 83 (D.Me.2001). Agent Milligan found the results of the scan to show evidence of a marijuana grow operation.[2] While conducting the scan, Agent Milligan noted in his affidavit that he also observed a "super-bright" light emitting from a second-floor window through a one— to two-inch gap, although the light source could not be identified because the shade was pulled nearly all the way down. Gov't Ex. C at 9.

On April 12, 2001, Judge Paul Cote of the Maine District Court issued a search warrant that authorized law enforcement officers to search the premises at 60 Academy Street (the home of defendant Eric Holmes) in Auburn, Maine and to seize evidence relating to a suspected marijuana grow operation. The warrant required that the executing agents provide "notice of their purpose and office" (otherwise known as a "knock and announce" warrant), which the Government concedes requires the agents to provide "pre-entry notice" before entering the premises. *See*

---

1. A "trash pull" is when officers attempt to inspect the contents of a target's trash for evidence of criminal activity. In this case, Agent Slivinski stated in his affidavit that "the trash was kept on the porch prior to trash day and was inaccessible ... without entering the curtilage." Govt. Ex. B at 5–6.

2. The thermal imaging scan produced a reading indicating that the temperature of the surface area of the front second floor was significantly higher than all of the remaining

sides and levels of the residence and that substantially more heat was escaping from that area than any other part of the house. Four images were prepared and submitted with the affidavit, including imaging of a neighbor's home for comparison. Other similar structures in the neighborhood were scanned and did not exhibit the same elevated temperature as the target residence's second floor. Gov't Ex. C.

Government's Objection to Defendant's Motion to Suppress and Incorporated Memorandum at 1, n. 1.

Officer Dan LaChance was in charge of effecting the execution of the warrant. Agents gathered on the day of the search for a preraid tactical briefing, where they were alerted by Officer LaChance that the warrant required them to knock and announce before entering. Tr. at 23. Agents arrived at Defendant's residence to execute the warrant at approximately 2:40 p.m. on April 12. The officers, including Officer LaChance and Agent Slivinski, were unfamiliar with how people customarily gained entrance into the residence. Tr. at 24, 33. They first approached a door on the side of the building that they "realized... was not the door that probably [the occupants] used to get inside the residence." Tr. at 12. Two agents nevertheless remained at that door. *Id.* The remaining seven agents moved to the door at the front of the house, which they determined would be the appropriate point of entry. *See* Tr. at 12–13, Gov't. Ex. 1. At that entrance, the storm door was resting in the open position but the inner door was closed. Tr. at 13, Gov't Ex. 1. LaChance testified, "I was knocking on the door, I waited a couple of seconds ... and at the same time someone told me they believed it was an entry way with a shed."[3] Tr. at 13. After waiting "three seconds, three to five seconds," LaChance testified, "I tried the door, it wasn't locked, so I opened the door" and entered "thinking there would be another door inside the house." Tr. at 15. It was then that the agents first announced their identity and purpose; Officer LaChance testified, "[a]s soon as I walked in and saw the door and realized I'm pretty much straight shot into the house, I yelled 'Police! Search warrant.'"

Tr. at 26. LaChance was immediately followed by others who, with weapons drawn, ran in through the kitchen area and into the living room, where they saw Defendant's father seated in a chair, watching television. Tr. at 18, 27. The police handcuffed Defendant's father and proceeded to conduct the search of the residence. Tr. at 17, 19.

The agents searched the house and found a total of 164 marijuana plants, a firearm, and various items of physical evidence believed by the agents to be associated with marijuana cultivation. During the search, Eric Holmes arrived at his residence. Tr. at 20. Much of the substantive physical evidence was found in a second-floor room. Tr. at 19. Then the agents came upon a bolted door to the basement, and Officer LaChance asked Eric Holmes for a key. Tr. at 20–21. Because he could not provide one, the agents used a ram to break down the internal door and found what they believed to be another "grow room" in the basement. Tr. at 21. Holmes was arrested at the scene.

## II. DISCUSSION

### A. Search Warrant: Probable Cause

 The Fourth Amendment protects an individual's reasonable expectation of privacy against intrusion by the government. The test for determination of a reasonable expectation of privacy is twofold: (1) the defendant manifests an actual, subjective expectation of privacy and (2) the expectation is one that society is prepared to recognize as legitimate. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Kyllo v. United*

---

**3.** As LaChance knocked, he testified that he heard an agent from behind him say "this was just an entry or breezeway to the house." Tr. at 13–14.

*States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), the Supreme Court held that the use of a thermal imaging device is a search within the meaning of the Fourth Amendment. Upon a motion to suppress evidence obtained in execution of a search warrant, it sometimes happens that "a showing is made for the first time that some of the information in the affidavit presented to the warrant-issuing magistrate was acquired in a prior illegal search." 2 W. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.4(f) at 287 (3d Ed.1996). The First Circuit Court of Appeals, along with many other circuits, has determined that the search warrant "is nonetheless valid if it could have issued upon the untainted information in the affidavit." *Id.* (citing, *inter alia, United States v. Veillette,* 778 F.2d 899 (1st Cir.1985)). The Court believes that the proper procedure is for this Court to examine the affidavits for probable cause after excising the tainted averments. *See, e.g., United States v. Herrold,* 962 F.2d 1131, 1138, 1143–44 (3rd Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992) (When a court reviews an affidavit from which unconstitutionally seized evidence has been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrant).

Defendant argues that without the information obtained from the thermal imaging scan, there was insufficient probable cause to issue a search warrant for his residence. The Government responds that even without evidence obtained via the thermal imaging device, there is sufficient probable cause in the information and affidavits to support the issuance of a valid search warrant. Excluding the results of the thermal imaging scan, the magistrate judge was presented with information including: (1) the hearsay information of two unidentified sources who claimed to have been inside the Holmes residence, which was filtered through CD # 1 (a first-time cooperating informant) to Agent Baril and then to affiant Agent Slivinski; (2) Agent Baril's determination of Defendant's prior criminal history; (3) the power consumption records at a house where the source of heat was unknown; and (4) the observation of a "super-bright" light emanating through a one-to-two inch gap of a second-floor window.

■■■ Determining the existence of probable cause for issuing a search warrant requires a "totality of the circumstances" analysis. *Illinois v. Gates,* 462 U.S. 213, 241, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).

> The sufficiency of a search warrant affidavit is appraised against well-established criteria: The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*United States v. Taylor,* 985 F.2d 3, 5 (1st Cir.1993) (citations omitted). The original source of information leading to a search may be anonymous if it is accompanied by factors vouching for the reliability of that source's assertions. *United States v. Burke,* 999 F.2d 596, 598 (1st Cir.1993). In *Burke,* it was "significant that the source's information was based on personal observation." *Id.* Where an informant's information is not first-hand, it may be less reliable because "an important indicia of reliability is the fact that the informant's knowledge was based upon personal observation rather than hearsay." *U.S. v. Coch-*

*rane*, 896 F.2d 635, 641 (1st Cir.1990) (citing *United States v. Harris*, 403 U.S. 573, 581, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971)). In *Burke*, the police officer affiant involved in executing the search warrant at issue had previously executed a similar search warrant at the same house, which had uncovered an elaborate indoor marijuana growing operation. *Burke*, 999 F.2d at 598. The affiant's knowledge that the defendant had not been prosecuted for that offense also dovetailed with the anonymous source's information that the defendant had "beat the charge" resulting from that search. *Id.* The fact that both the source and the officer knew about the defendant's criminal history served to corroborate the source's reliability. *Id.* Finally, although the tipster did not provide information based on her own, personal observation, she had previously provided reliable information; the Court of Appeals attached "weight" to the fact that the confidential informant had provided information in the past that led to three felony drug arrests and the seizure of several pounds of marijuana. *Id.* at 599. In this case, although CD #1 saw Friend enter Defendant Holmes's residence, CD #1 neither personally entered the residence, knew Defendant Holmes, bought marijuana from him, nor saw any of the alleged evidence of activity of the marijuana grow. This case is distinguishable from *Burke* because there is simply insufficient evidence supporting the reliability of the anonymously provided information. CD #1's information is based entirely on hearsay from the anonymous sources, UI #1 and the unidentified mutual Friend. CD #1 had never before provided information to law enforcement officers, and no one can vouch for the anonymous, unknown sources.

■ The "very specificity and detail with which [the affidavit] relates the informant's *first-hand* description of the place to be searched or the items to be seized" may disclose an adequate basis for evaluating the informant's veracity. *Id.* at 6 (emphasis in original); *see also United States v. Scalia*, 993 F.2d 984, 987 (1st Cir.1993) (confidential information provided to agent by informant with no criminal record and who, from personal knowledge, described interior and contents of residence with such precision as to provide "considerable intrinsic support for the informant's capacity to convey reliable intelligence relating to the criminal activity attested to in the affidavit."). The *Scalia* Court, however, also placed weight on the informant's lack of a criminal record or suspected current criminal activity: "[i]n the absence of a prior record of reliability ... where the informant was '*not a professional*' ... but a private citizen with *no known criminal record* or other criminal contacts ... the informant's story may be more easily accepted...." *Scalia*, 993 F.2d 984, 987 (citations omitted, emphasis in original). In this case, CD #1 is a cooperating defendant whose source of information is not his/her own personal knowledge, but information from anonymous individuals, one of whom—Friend—admits to buying marijuana from, and smoking it with, Defendant. CD #1's other source of information described Holmes' grow operation in very general terms, including allegedly having seen high-intensity grow lights mounted on motorized tracks, carbon dioxide gas, and bags of recently harvested marijuana. Unlike the informant in *Taylor*, who provided a detailed, first-hand description, the informant in this case, CD #1, had no first-hand information regarding evidence of criminal activity. Although the original sources of the information in this case gave first-hand descriptions to CD #1, CD #1 then relayed hearsay information to one officer, Agent Beril, who then told

another officer, Agent Slivinski, who authored the affidavit, which included the now third-hand information; this is simply too attenuated to bolster the reliability of the original sources. The original sources of information provided no particular level of detail regarding the premises or the criminal activity.

■■■ An agent's "extensive experience as a law enforcement officer... [may] buttress... informant-based indicia of probable cause." *Taylor*, 985 F.2d at 6. Prior experience with an informant permits an agent to vouch for the reliability of a confidential informant's statement based on personal knowledge. *Id.* CD # 1 had not previously cooperated with law enforcement officers in order for them to have a prior basis for determining his/her reliability or to permit prior veracity to corroborate his/her information. An affiant's knowledge of a target's prior criminal history is also material to the probable cause determination. *Id.* Corroboration of an informant's tip may take other forms, such as a check of a target's criminal record, and surveillance is not necessarily required in all circumstances.[4] *Scalia*, 993 F.2d at 988; *see also Taylor*, 985 F.2d at 6. The Agents did corroborate the tip by checking Eric Holmes's criminal record and determining that he had a prior drug conviction.

■■■ While there is unusually high power consumption for sustained periods of time at the Holmes residence, the Court disagrees with Agent Milligan's characterization of the electric power consumption charts. In Agent Milligan's affidavit, he claims that the power records show four distinct three-month cycles from March to May 2000, July to October 2000, November 2000 to January 2001, and February to April 2001. A number of factors could explain high usage or increases in usage, such as changes in the number of people living in the residence, use of electrically powered heating and cooling equipment. From the power usage charts submitted with the affidavit, it appears to the Court that there may possibly be two spikes, one from March to June 2000 and one from November 2000 to February 2001, which are both periods longer than three months. The Court also notes that if the marijuana cultivation were continuous, *e.g.*, if different plants were in different stages of growth at different times, the records might not indicate "distinct spikes" at all, but a more sustained seemingly abnormally high usage, which would appear consistent with the records in this case. Surveillance of the residence on more than, what appears from the record to be, a couple of occasions may have eliminated some of the possible explanations for the unusually high use of electric power.[5] The force of the electric power records alone does not persuade the Court of the probability of a marijuana grow.

The Court is also concerned about the import of what Agent Milligan stated in his affidavit was a "super-bright light emitting from [a one-to-two inch gap in] a window on the second floor." Gov't Ex. C. Agent Milligan did not testify at the suppression hearing. Although Agent Slivinski was

---

4. A police officer's knowledge may corroborate an informant's awareness of a target's prior criminal activity. *Burke*, 999 F.2d at 598. Although Agent Baril ascertained Defendant Holmes's prior drug conviction, neither CD # 1 nor his/her sources knew about Holmes's criminal record. Additionally, local authorities had no former interactions with Defendant or his residence and no information about him other than obtaining his criminal history from another state.

5. Officer LaChance testified, "Agent Slivinski had been by [the Holmes residence] a few times." Tr. at 22.

present when the light was observed—on the night the thermal imaging scan was performed—he neither put anything about the light in his affidavit nor testified about the appearance of the light except to say, "we saw what would be grow lights." Tr. at 36. Given that there was no testimony about the illuminatory power of grow lights, this conclusory statement does not assist the Court in determining the weight to give it or Agent Milligan's statement that the light was "super-bright."

■ Some of the information gained in the investigation dovetails to bolster the reliability of the information provided by the original, anonymous sources. That is, that two unidentified sources claimed that Eric Holmes was cultivating marijuana in his home, the alleged presence of what an officer took to be grow lights, and the criminal history check, which showed Holmes had previously been convicted of a drug offense. Given the fact that the Court finds the anonymous sources' information to be of marginal reliability, the degree of dovetailing does not create significant indicia of reliability. Accordingly, after expunging the information obtained from the thermal imaging device, the Court concludes that there is insufficient evidence to support probable cause for the issuance of a warrant to search Defendant's residence.

## B. The *Leon* Exception

The inquiry does not end there, however, because the Government argues that information obtained from the use of the thermal imaging device, although a search within the meaning of the Fourth Amendment, may still be considered, under *Leon*, because the officers relied in good faith on the search warrant, which was based, in part, on acceptance of the constitutionality and validity of the warrantless use of a thermal imaging device. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Defendant argues that *Leon* is not applicable to this case. In *Leon*, the Supreme Court recognized "a good-faith exception to searches conducted pursuant to warrants." *Id.*, 468 U.S. at 924, 104 S.Ct. at 3421. The Court of Appeals for the First Circuit stated, in *United States v. Curzi*, 867 F.2d 36, 44 (1st Cir.1989), "this court has not recognized a good-faith exception in respect to warrantless searches." The Court found that *Leon's* good-faith exception was not applicable as an exception to the exclusionary rule, in *Curzi*, where the government conducted a warrantless search claiming exigent circumstances, rather the Court reiterated that *Leon* only applied to searches conducted in good-faith reliance on a warrant or a statute later declared to be unconstitutional.[6] *Id.*, 867 F.2d at 44–45. At

**6.** The Court has not been able to find any case in this Circuit applying *Leon* where the basis of officers' reliance is a prior court decision on precisely the same issue as in the case before the deciding court, which decision has subsequently been overturned and its' reasoning invalidated. This Court confesses discomfort at the thought of permitting the consideration of evidence, even under *Leon*, that the Supreme Court has recently ruled to be the subject of an unconstitutional search and seizure.

Supreme Court cases after *Leon* do not address searches based on warrants where the caselaw or legal precedent supporting them has been reversed or overruled, but only cases where reliance is on a statute or warrant which is later invalidated. In *Massachusetts v. Sheppard*, 468 U.S. 981, 990, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), a companion case to *Leon*, the Supreme Court held that the exclusionary rule would not be applied to suppress the fruits of a search warrant upon which police officers placed objectively reasonable reliance, based on the issuing judge's advice that all necessary clerical changes had been made in the defective warrant form. In *Illinois v. Krull*, 480 U.S. 340, 358, 107 S.Ct.

1160, 1171–72, 94 L.Ed.2d 364 (1987), the Supreme Court extended *Leon's* good-faith exception to officers' reliance on a statute, which authorized warrantless administrative searches, ultimately found to violate the Fourth Amendment. More recently, in *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), the Supreme Court held that evidence seized in violation of the Fourth Amendment as a result of clerical errors of court employee, which caused incorrect computer records, fell within the good-faith exception to the exclusionary rule.

The cases closest to the issue, which the Court has found from other Circuits discuss applicable legal standards at the time of the search and focus on why suppression will not foster deterrence. In *United States v. Henderson*, 746 F.2d 619, 625 (9th Cir.1984), the Court of Appeals for the Ninth Circuit upheld, under *Leon's* good-faith exception, a search warrant whose issuance was based on that Court's prior holding that beeper monitoring was not a search and required no warrant, which was later held by the Supreme Court, in *United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), to be a search requiring a warrant. Because the search warrant in that case "was based on a probable cause determination that comported fully with applicable legal standards at that time ... the agents reasonably relied on that [defective] warrant when they searched [defendant's] house and discovered the controverted evidence." *Henderson*, 746 F.2d at 625. The Court of Appeals for the Tenth Circuit, in *United States v. Rowland*, 145 F.3d 1194, 1207 (10th Cir.1998), stated that "at the time the warrant was issued and executed, this circuit had not yet ruled on the constitutionality of anticipatory warrants and had not set out conditions on the validity of such warrants. Given the unsettled state of the law, it was not unreasonable for the officers to rely on the magistrate's authorization." That Court referred to the holding in *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir.1985), wherein the Court stated "that in considering the *Leon* good-faith principles 'it must ... be remembered that the knowledge and understanding of law enforcement officers and their appreciation for constitutional intricacies are not to be judged by the standards applicable to lawyers.'" *Id.*, 145 F.3d at 1207–08. The Court of Appeals for the Third Circuit, in *Gluck v. United States*, 771 F.2d 750 (3d Cir.1985), upheld a search where IRS agents "acted in good faith reli-

ance on a facially valid *Rule 6(e)* order issued by a United States District Court." *Id.* at 758. A subsequent Supreme Court decision, *United States v. Baggot*, 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983), held that such an order would not be permitted, but the Court of Appeals found that the *Baggot* decision was not subject to retroactive application and upheld the search.

Reliance upon retroactivity jurisprudence, however, opens complex new vistas of analysis which do not necessarily dictate a clear result. *See, e.g. Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (holding that newly declared Constitutional rules should be applied retroactively); *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) (holding that another Supreme Court decision finding that a particular warrantless search lacked probable cause and contravened the Fourth Amendment would not be applied retroactively to defendant's case even though it was pending on appeal on date the decision was announced). In their dissent to the *Krull* decision, Justices O'Connor, Brennan, Marshall, and Stevens succinctly describe the Court's recent retroactivity jurisprudence, notwithstanding the majority's application of the *Leon* good-faith exception to that case. In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court held that " 'basic norms of constitutional adjudication' and fairness to similarly situated defendants, require that we give our decisions retroactive effect to all cases not yet having reached final, and unappealable, judgment." Illinois v. Krull, 480 U.S. 340, 368, 107 S.Ct. 1160, 1176–77, 94 L.Ed.2d 364 (citing *Griffith*, 479 U.S. at 322, 107 S.Ct. at 713). *But see, United States v. Bowen*, 422 U.S. 916, 919, 95 S.Ct. 2569, 2572, 45 L.Ed.2d 641 (1975) (stating "The Border Patrol reasonably relied on the decisions of the Courts of Appeals in performing the search in this case and others like it, and in these circumstances the purposes of the Fourth Amendment exclusionary rule would not be served by applying the principles of *Almeida–Sanchez* retroactively.")

The Supreme Court's Fourth Amendment jurisprudence also describes a "judicial integrity" principle, which, albeit a subordinate factor to deterrence, which is the "prime purpose of the exclusionary rule," nevertheless provides a relevant consideration when admitting evidence. *United States v. Janis*, 428 U.S. 433, 458 n. 35, 96 S.Ct. 3021, 49 L.Ed.2d

a minimum, the exception "will not be applied unless the officers executing search warrants act within the scope of the warrants and abide by their terms." *Curzi*, 867 F.2d at 44. Because the warrant here was issued prior to the Supreme Court's holding in *Kyllo*, 533 U.S. at ——, 121 S.Ct. at 2043, 150 L.Ed.2d 94, that the use of a thermal imaging device constitutes a search under the Fourth Amendment, the officers, affiants, and issuing judge relied on then-current caselaw holding that thermal imaging was *not* a search under the Fourth Amendment. *See Woodward*, 154 F.Supp.2d at 87.[7] The unconstitutional execution of the warrant renders such a discussion and the resolution of the issues it generates, *see* n. 6 *supra*, moot. Because the agents did not "abide by [the] terms" of the warrant, the Court need not discuss *Leon's* applicability or the validity of the warrant further. *See infra* Section C.

### C. Execution of the Warrant

▬▬ Defendant argues that the agents failed to properly knock and announce their presence and to wait a reasonable time before entering his residence.

In *Kyllo*, the Supreme Court reiterated, "[w]e have said that the Fourth Amendment draws 'a firm line at the entrance to the house.'" *Kyllo*, 533 U.S. at ——, 121 S.Ct. at 2046, 150 L.Ed.2d at 106 (2001) (citing *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). The Government concedes that the search warrant in this case required the agents to knock and announce their presence.[8] The Government concedes that an officer must wait a reasonable period of time before making an entry, and that delays of five seconds or less are typically unreasonable. *See* Government's Post–Hearing Brief at 3, *United States v. Dice*, 200 F.3d 978, 983 (6th Cir.2000); *United States v. Sargent*, 150 F.Supp.2d 157, 160 (D.Me.2001) Singal, D.J. (holding that the exclusionary rule applies to knock-and-announce violations). The Government argues that the failure to knock and announce in this situation, however, was not unreasonable.

▬▬ The Supreme Court held in *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), that the circumstances allowing officers to enter

---

1046 (1976). However, the Court stated in *Janis*, "[j]udicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment. The requirement that a defendant must have standing to make a motion to suppress demonstrates as much." *Id.*

To say that an exception exists under the *Leon* rule to the application of the United States Supreme Court's holding in *Kyllo* (invalidating the "no-search" rationale in the *Woodard* case), which would permit the principle of the *Kyllo* holding to be ignored *in this post-Kyllo case*, to Defendant's prejudice, creates logical and rationalogical anomalies in implementation of Fourth Amendment doctrine of a decidedly perverse effect.

Here, the Court's finding, *infra*, of unlawful execution of the warrant makes it unnecessary to resolve this matter in order to decide this case. *See infra* at § C.

**7.** In his affidavit for the warrant application, Agent Milligan cited to *Woodward*, 154 F.Supp.2d at 87 and *Kyllo*, 190 F.3d 1041 (9th Cir.1999) (holding thermal image scanning not to be a search requiring probable cause under the Fourth Amendment).

**8.** The warrant required that the executing agents provide "notice of their purpose and office" (otherwise known as a "knock and announce" warrant), which the government concedes requires the agents to provide "pre-entry notice" before entering the premises. *See* Government's Objection to Defendant's Motion to Suppress and Incorporated Memorandum at 1, n. 1. Officer Dan LaChance, the officer in charge of executing the warrant, explained at the hearing that they did not seek a "no-knock" warrant because this search was not "a high-risk search warrant." Tr. at 9; *see also* M.R.Crim.P. 41(i).

before waiting a reasonable period of time normally involve countervailing law enforcement needs, such as the need to prevent the destruction of evidence or to prevent violence. While an unannounced entry can certainly be reasonable under appropriate circumstances, the cases cited by Government are inapplicable here. The warrant issued here required a knock and announce and a reasonable wait prior to entry. Although the common law of Maine "does not prescribe a precise rule as to how long a police officer must wait after knocking and announcing before he may enter a residence ..., [c]ourts rely on the Fourth Amendment's standard of reasonableness" to determine whether a search was constitutional. *Sargent,* 150 F.Supp.2d at 160 (citing *United States v. Ramirez,* 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998)). Officer La-Chance knocked at the front door, waited two to five seconds, and then, he testified, "... I tried the door, it wasn't locked, so I opened the door and once inside that door ... I looked to the left." Tr. at 15. Once inside the home, Officer LaChance immediately recognized that the entry way led directly into the home and then, for the first time, the agents announced their identity and purpose. According to LaChance's admission, he didn't announce his presence until he was inside the residence: "As soon as I walked in and saw the door and realized I'm pretty much straight shot into the house I yelled 'Police! Search warrant.'" Tr. at 26. In *Sargent,* the Court recently held that police conducted a *de facto* no-knock entry to an apartment when they smashed down the door after waiting only five seconds for a response to their announcement of presence and intent to enter. *See Sargent,* 150 F.Supp.2d at 161. In reaching this conclusion, Judge Singal noted that most courts faced with a delay of less than five seconds have found it an unreasonably short time. Specifically, the Court stated that, "[a]bsent exigent circumstances, 'a delay of five-seconds or less after knocking and announcing has been held' to be an unreasonably short period of time." *Id.* at 160 (quoting *United States v. Jones,* 133 F.3d 358, 361 (5th Cir.1998) (collecting cases)); *see also, United States v. Lucht,* 18 F.3d 541, 550–51 (8th Cir.1994). This Court agrees.

The caselaw in the First Circuit further supports the conclusion that two to five seconds is not a reasonable wait before entering a residence with a knock and announce warrant.[9] The Court of Appeals for the First Circuit has held that ten seconds is *not* necessarily an unreasonable wait before entering with a knock and announce warrant. *See United States v. Garcia,* 983 F.2d 1160 (1st Cir.1993) (holding that a ten-second wait with a knock and announce warrant was not, as a matter of law, too short where officers faced exigent circumstances). In *United States v. One Parcel of Real Property,* 873 F.2d 7 (1st Cir.1989), the Court of Appeals held that a five— to ten-second wait with a knock and announce warrant was not too short when accompanied by previous knocks and shouts at another door by another police officer. Unlike the officers in *One Parcel* who knocked at another door prior to entering the home from a different

---

9. Well-developed caselaw of the Sixth Circuit Court of Appeals lends additional support for this conclusion. The government argued, in *Dice,* that failing to knock was a more egregious violation that failing to wait more than a "few" seconds, but the Court of Appeals for the Sixth Circuit clarified, "A court cannot sever the requirement that an officer wait a reasonable time before forcing his way into a residence from the requirement that he knock and announce his presence in the first place." *United States v. Dice,* 200 F.3d 978, 984 (6th Cir.2000).

entrance, the agents here failed to properly knock or announce their presence at either door. Under these circumstances, a two— to five-second delay before entering the home is not the type of action that is "reasonable" for police officers to take.

The Court finds that the delay of only two to five seconds without the officers identifying themselves is a *de facto* no-knock entry. The Supreme Court stated, in *Ramirez*, 523 U.S. at 65, 118 S.Ct. at 994, 140 L.Ed.2d 191 (citing *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997)), that officers must possess "reasonable suspicion" in order to conduct a no-knock entry. The Supreme Court held that " '[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.' " *Ramirez*, 523 U.S. at 70, 118 S.Ct. at 996 (quoting *Richards*, 520 U.S. at 394, 117 S.Ct. at 1421). Although the Constitution creates a "presumption in favor of announcement," the Court of Appeals for the First Circuit has held that this presumption yields under certain circumstances, including those "presenting a threat of physical violence," or when police have a " 'reasonable suspi-

cion' that knocking and announcing would be dangerous ... to the purposes of the investigation." *United States v. Hawkins*, 139 F.3d 29, 32 (1st Cir.1998) (quoting *Wilson*, 514 U.S. at 936, 115 S.Ct. at 1918–19 and citing *United States v. Ramirez*, 523 U.S. 65, 69–71, 118 S.Ct. 992, 996, 140 L.Ed.2d 191 (1998)). This postulate also yields "where police officers have reason to believe that evidence would be destroyed if advance notice were given." *Wilson*, 514 U.S. at 935–36, 115 S.Ct. 1914, 131 L.Ed.2d 976. The Court of Appeals for the First Circuit has reiterated the standard to determine whether exigent circumstances excuse noncompliance with the knock-and-announce rule as one of "reasonable suspicion" based on the particular circumstances of the case. *See Hawkins*, 139 F.3d at 32 (quoting *Richards*, 520 U.S. at 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 and *Ramirez*, 523 U.S. at 66–67, 118 S.Ct. at 995).[10] In *Hawkins*, the police's no-knock entry "was not a spur of the moment decision by the executing officers" because the search warrant had been issued as such by a judicial officer based on the attesting police officer's personal knowledge of the defendant's record of violent convictions, a recent armed action, and the officer's suspicion that the defendant was aware of police interest in him. *Id.* Furthermore, whenever the reasonableness of a no-knock entry is challenged, the police must demonstrate the existence of reason-

10. Caselaw in other Circuits supports this interpretation, as well. The Court of Appeals for the Sixth Circuit has held that exigent circumstances relieve officers of the knock-and-announce requirement when the person within the residence already knows of the officers' authority and purpose, or when officers have a justified belief either that someone within is in imminent peril of bodily harm or that those within are aware of the officers' presence and are engaged in escape or destruction of evidence. *See United States v. Dice*, 200 F.3d 978, 983 (6th Cir.2000) (citing *Wilson*, 514 U.S. at 936, 115 S.Ct. 1914 (stat-

ing that announcement was unnecessary when it would constitute a "senseless ceremony")). The burden of proof rests with the government to show such circumstances. *Id.* The Court of Appeals for the Fifth Circuit has also held that absent any articulation of reasonable suspicion that announcing their presence would be dangerous, futile, or would result in the destruction of evidence, officers' initial attempts to forcibly enter a defendant's home were unreasonable and violated the Fourth Amendment. *United States v. Cantu*, 230 F.3d 148 (5th Cir.2000).

able suspicion to justify an unannounced entry. *See Wilson,* 514 U.S. at 936, 115 S.Ct. at 1919. The Court agrees with Defendant that this *de facto* "no-knock" entry was not reasonable under the circumstances of this case.

The Government cites to cases in which courts have recognized a "useless gesture" exception to the knock and announce rule where occupants have actual advance knowledge of the impending raid. *See Miller v. United States,* 357 U.S. 301, 310, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *United States v. Nicholas,* 319 F.2d 697, 698 (2d Cir.1963). That is not this case. The Government fails to articulate any reason explaining why the agents may have had a reasonable suspicion that waiting more than two to five seconds before deciding to enter would have been "useless" in this case. Although Defendant's father was sitting in a chair, watching television, there is no evidence in the record that the agents heard the television before entering the house or found the noise from inside the residence to be so loud that any occupant could not have heard their knock. In fact, the Government strains credulity in arguing that two to five seconds was a reasonable amount of time to wait in order to give Defendant's father an opportunity to voluntarily answer the door—especially if it were an outer door. The Court agrees with Defendant's characterization of the law on this point, which is that the "reasonableness" of an entry "must be viewed in light of 'what the officers had reason to believe *at the time of their entry* ....' " *United States v. Daoust,* 728 F.Supp. 41, 50 (D.Me.1989), *aff'd.,* 916 F.2d 757 (1st Cir.1990) (quoting *Ker v. California,* 374 U.S. 23, 40–41 n. 12, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963))(emphasis in *Daoust* ). Furthermore, in *Kyllo,* the Supreme Court reiterated the importance of a citizen's privacy in his home: "there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the ... rug on the vestibule floor. In the home ... the entire area is held safe from prying government eyes." *Kyllo,* 533 U.S. at ——, 121 S.Ct. at 2045, 150 L.Ed.2d 94. The Supreme Court has been unwilling to hold that privacy rights in the home

> 'are to be measured in fractions of inches.' But [that] decision [did] not turn upon the technicality of a trespass upon a party.... It is based upon the reality of an actual intrusion into a constitutionally protected area. What the Court said long ago bears repeating now: 'It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.'

*Silverman v. U.S.,* 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (quoting *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886)). The only basis asserted by Government is that Officer LaChance opened the door upon hearing someone from behind him say "this was just an entry or breezeway to the house." Tr. at 14. At the time of their entry, the agents had no information about the interior layout of the house. Moreover, the agents did not even allege that they believed knocking or announcing would be a useless gesture because of loud television noises or any other articulated reasonable suspicion that a no-knock entry was warranted. The Court has looked at the photograph of Defendant's house and finds that Officer LaChance's stated belief that the outside door would not lead directly into the home was simply not reasonable at the time of entry, which is the point at which it must be gauged. The Court, therefore, finds that the agents'

actions in entering the residence before waiting more than a couple of seconds was not constitutional.

### III. CONCLUSION

Accordingly, the Court **ORDERS** that Defendants' Motion to Suppress be, and it is hereby, **GRANTED**.